## HAYWOOD et al. v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. October 5, 1920. Rehearing Denied December 9, 1920.)

### No. 2721.

1. **Constitutional law ⬪271—Criminal law ⬪1005—Right of review not essential to due process.**

   The right to a review of a judgment of conviction by an appellate court is not essential to due process of law, since all the rights of accused necessary to due process are fully protected in the trial court.

2. **Criminal law ⬪1186(2)—Congress can prohibit reversals on errors not substantially prejudicial.**

   Since Congress could have withheld entirely the privilege of review of a conviction for crime, Comp. St. Ann. Supp. 1919, § 1246, providing that no error shall require the reversal of the judgment, unless it can be affirmatively shown from the record as a whole that the party complaining thereof has been denied some substantial right, whereby he has been prevented from having a fair trial, is a valid reduction of the privilege of review.

3. **Army and navy ⬪40—Espionage and Selective Service Acts repealed general statute.**

   Penal Code, § 6 (Comp. St. § 10170), denouncing conspiracies to use force to prevent, hinder, or delay the execution of any law of the United States, does not apply to forcible obstruction of the Selective Service Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044k) and the Espionage Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 10212a–10212h), the penal provisions of which constitute the specific directions for the punishment of all obstructions, forcible or otherwise, of the recruiting and enlistment service, and repeal pro tanto Penal Code, § 6, since Congress did not intend to inflict punishment twice for the same offense.

4. **Conspiracy ⬪34—Forcible prevention of production for sale to government not prohibited.**

   A conspiracy to prevent by force private individuals from producing goods to fulfill their contracts with the government is not punishable under Penal Code, § 6 (Comp. St. § 10170), applying to conspiracy to

prevent the execution of the laws of the United States, since that section is limited to obstruction of the enforcement of the laws by the officers of the government charged with that duty.

**5. Conspiracy �köm30—Forcible prevention of production not interference with right under United States Constitution or laws.**

The right of an individual or corporation to produce goods to sell to the government is not a right or privilege conferred by the Constitution or laws of the United States, so that a conspiracy to prevent such production by force is not punishable, under Penal Code, § 19 (Comp. St. § 10183), denouncing conspiracies to injure citizens of the United States in the exercise of any right or privilege secured to them by the Constitution and laws of the United States.

**6. Criminal law ⊜⊸395—Fifth Amendment does not prohibit use of evidence illegally seized.**

Const. Amend. 5, providing that no person shall be compelled in any criminal case to be a witness against himself, though not limited to the compelling of testimony by the witness in court, is limited to testimonial compulsion, and does not prohibit the use against a defendant of his papers and documents illegally seized by officers of the government.

**7. Searches and seizures ⊜⊸5—Fourth Amendment does not entitle members of voluntary association to return of association property.**

Const. Amend. 4, protecting persons against unlawful search and seizure, does not entitle the members of a voluntary association to ask as individuals a return of property of the association unlawfully seized by government officers, since, except for purposes of contractual liability, the association is distinct from its members, and the several members are not entitled to possession of its property.

**8. Indictment and information ⊜⊸125(5½)—Charging conspiracy to prevent registration and to induce desertions not duplicitous.**

An indictment charging a conspiracy to violate the Selective Service Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044k), by preventing registration thereunder and by inducing desertions of those who had registered, is not duplicitous as charging two conspiracies, one of which could not by its nature originate until the other was terminated, since the intention to procure desertions of those who registered under the Selective Service Act and plans to effect that intention could have been formed before the day of registration.

**9. Conspiracy ⊜⊸43(5)—Particular way overt acts furthered conspiracy need not be alleged.**

It is not necessary that the pleading should show the particular way in which the overt acts alleged furthered the conspiracy.

**10. Indictment and information ⊜⊸101—Description of class intended to be influenced by conspiracy to prevent registration held sufficient.**

In an indictment for conspiracy to violate Selective Service Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044k), the charge that defendants conspired to prevent the registration of the 10,000 members of a voluntary association required to register, whose names were to the grand jury unknown, and to induce the 5,000 members of that association who did register under that act to desert the military service, sufficiently describes the class of individuals to be influenced by the conspiracy.

**11. Conspiracy ⊜⊸43(5)—Substance of newspaper articles to cause insubordination need not be alleged.**

An indictment for conspiracy to violate the Espionage Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 10212a–10212h) by the publication of newspaper articles, solicitations, and speeches is not defective for failure to set out the articles verbatim or in substance, since the allegation that such articles were persistent urgings of insubordination and refusal to

⊜⊸For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

enlist are sufficient to identify the articles, as well as to identify speeches and solicitations, especially where the overt acts set forth several articles from the named newspapers, which would help inform defendants of the exact nature of the charge against them.

12. **Criminal law** ⟨⟩**1134(6)—Erroneous admission of evidence harmless, if admissible on any ground.**

If it was error to admit evidence of defendants' other acts, not criminal when committed, to show intent, the ruling was harmless, if such matters were in fact admissible on any ground.

13. **Criminal law** ⟨⟩**371(1), 374—Prior acts, not offenses when committed, not admissible to prove intent.**

Though prior offenses are admissible in certain classes of cases to prove criminal intent, prior similar acts, which were not offenses when committed, are not admissible to show an intent to commit the same acts after they were made offenses.

14. **Conspiracy** ⟨⟩**45—Evidence of organization before Espionage Act admissible to show knowledge of means.**

Though evidence of the organization of an association, the defendant's control thereof, and the methods of its operation before the enactment of the Espionage Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 10212a–10212h), was inadmissible to show an intent to violate that act, such evidence was admissible in a prosecution for conspiring to violate the act to show defendants' possession and knowledge of the use of the means by which the act could be violated.

15. **Criminal law** ⟨⟩**374—Articles printed before enactment of Espionage Act admissible, if used afterward.**

Newspaper arucles urging insubordination among the military forces, which were printed before their publication was made an offense, are admissible in a prosecution for the offense, if they were used by defendants for the prohibited purpose after the statute was enacted.

16. **Conspiracy** ⟨⟩**45—Articles contemplating enactment of Selective Service Act admissible to show intent.**

In a prosecution for conspiracy to induce violation of the Selective Service Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044k), correspondence, newspaper articles, and pamphlets antedating passage of that act, but which contemplated its passage and declared a purpose to violate and obstruct it when passed, were admissible as bearing directly upon criminal intent.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

William D. Haywood and others were convicted and sentenced on each of four counts of an indictment for conspiracy to violate or obstruct the execution of sundry laws of the United States, and they bring error. Judgment modified, by striking therefrom the imprisonments and fines assessed under counts 1 and 2, and, as modified, affirmed.

George F. Vanderveer and Otto Christensen, both of Chicago, Ill., for plaintiffs in error.

Charles F. Clyne and Joseph B. Fleming, both of Chicago, Ill., for the United States.

Before BAKER, ALSCHULER, and PAGE, Circuit Judges.

BAKER, Circuit Judge. Plaintiffs in error were sentenced on each of four counts of an indictment for conspiracy to violate, or to

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

obstruct the execution of, sundry laws of the United States. Terms of imprisonment, separately assessed against each defendant on each count, were to run concurrently. As the prison sentence under the fourth count equals or exceeds in each instance the period fixed under the other counts, it would be unnecessary, if the case sought to be made under the fourth count was adequately pleaded and proved, to inquire further, except for the fact that separate fines were levied under each count. For example, many defendants were fined $5,000 under the first count, $5,000 under the second, $10,000 under the third, and $10,000 under the fourth. And since these fines cannot be satisfied by payment under any one count, the defendants are entitled to a review of the case under each count.

[1, 2] Before proceeding further, we think it right to emphasize the fact that a review by an appellate tribunal is not a requirement in affording a defendant the due process of law that is secured to him by the Constitution. In England writs of error in criminal cases are of comparatively recent origin. In our country, though writs of error within certain limitations have been allowed from the beginning, the grant has been of grace or expediency, not of constitutional demand. In the court of first instance the defendant is given his day in court, his trial by jury, his opportunity to confront opposing witnesses, and all other elements of due process of law. And if Congress might have withheld entirely the privilege of review, it is self-evident that Congress may at any time reduce the previously granted privilege. From recent legislation (40 Stat. pt. 1, p. 1181, Comp. St. Ann. Supp. 1919, § 1246) we gather the congressional intent to end the practice of holding that an error requires the reversal of the judgment unless the opponent can affirmatively demonstrate from other parts of the record that the error was harmless, and now to demand that the complaining party show to the reviewing tribunal from the record as a whole that he has been denied some substantial right whereby he has been prevented from having a fair trial.

By demurrer, motion for directed verdict, requests for instructions, and motion in arrest, defendants challenged the sufficiency of the case as pleaded and proved under the first count.

Section 6 of the Penal Code, a re-enactment of section 5336 of the Revised Statutes (Comp. St. § 10170), is the basis of the count. It denounces conspiracies to use force to prevent, hinder, or delay the execution of any law of the United States.

Defendants, so the government contended, conspired to prevent by force the execution of the following laws: (1) The joint resolution of April 6, 1917, declaring war on Germany; (2) the President's proclamation of April 6, 1917, concerning conduct of alien enemies; (3) Act June 3, 1916, making provision for national defense; (4) Act July 6, 1916, making appropriations for fortifications; (5) Act of August 29, 1916, making appropriations for the naval service; (6) act of same date, making appropriations for the support of the army; (7) Act April 17, 1917, making appropriations to cover deficiencies; (8) Act May 18, 1917, known as the Selective Service Act; (9) Act June 15, 1917, making appropriations for urgent deficiencies; (10) Act July

24. 1917, to purchase, manufacture, and operate airships; (11) Act June 15, 1917, known as the Espionage Act; (12) the following sections of the Penal Code of March 4, 1909, namely, 4, 19, 21, 37, 42, 135, 136, 140, and 141.

How was the execution of these various laws to be prevented by force? Defendants were officers and agents of the Industrial Workers of the World. That organization was opposed to capitalism and the wage system, believed that the "workers" should seize the "tools of industry," was hostile to our system of government. denounced our entry into the war as the result of the influence and desire of the "ruling, capitalistic classes," and undertook to block our efforts to win. Defendants, having control of that organization as an instrument, conspired to have their members, who were workmen in factories engaged in producing war munitions and supplies, break machinery, spoil materials, strike, and use force to prevent other workmen from taking their places; also to have their members refrain from registering in obedience to the Selective Service Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044k), to have them desert, if brought into registration offices, and to rescue them by force, if caught; and also, in defiance of the Espionage Act, to cause all whom they could influence by speeches, pamphlets, and newspapers to keep out of the military service.

[3] Those parts of the case under the first count that have to do with violations of the Selective Service Act and the Espionage Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 10212a–10212h) must here be eliminated for the following reasons: Count 3 is for conspiracy to violate the Selective Service Act. Count 4 is for conspiracy to violate the Espionage Act. Granting that section 6 of the Penal Code, on which count 1 is predicated, is broad enough in its terms to cover conspiracies to use force in preventing, hindering, or delaying the execution of the Selective Service Act and the Espionage Act, the penal provisions of these last-named acts constitute the specific directions of Congress for the punishment of all obstructions, forcible or otherwise, of the recruiting and enlistment service. Congress did not intend, in the face of the constitutional prohibition, to inflict punishment twice for the same offense. Under the familiar maxim, "generalia specialibus non derogant," these specific provisions effected pro tanto a repeal of section 6. Snitkin v. United States (C. C. A.) 265 Fed. 489.

[4] There remains, then, the question whether forcible interference with the operations of producers from whom the government was expecting to buy or had contracted to buy war munitions and supplies constituted a forcible prevention of the execution of the acts of Congress in declaring war and making appropriations therefor.

Undoubtedly Congress, under the war power, could have protected by legislation the operations of such producers from all interference, forcible or otherwise, and as the war progressed various strengthening laws were enacted. But the question now before us concerns the true meaning of section 6. That was enacted long before the war. It must be enforced after the war is officially ended. Manifestly in

each period, before, during, and after, it must be given the same meaning and effect.

So the question under section 6 covers not only war supplies, but also any peacetime supplies which the government might intend to buy or had contracted to buy. The Government Printing Office is conducted under laws directing, and making appropriations for, its operations. Any direct interference by force with its operations might possibly be held to be a forcible prevention of the execution of laws of the United States. (Running a printing office, however, is a proprietary rather than a governmental function.) But the printing office cannot operate without paper. Suppose the workmen in a paper mill that has a contract to supply paper to the printing office, with knowledge of the contract and with intent to prevent the mill from fulfilling it, go on strike and forcibly prevent the running of the mill. Suppose that workmen in a hemlock forest, whose owner has a contract to supply logs to the paper mill that has a contract to supply paper to the printing office, with knowledge of those contracts and with the intent to prevent their execution, go on strike and forcibly stop the timberman's operations. And so on, along the whole imaginable line of "the house that Jack built." Are these forcible stoppers of industrial production guilty under section 6? How are the laws of the United States executed? By officials upon whom the duty is laid. Performance of that duty cannot be delegated. Producers, who have contracts to furnish the government with supplies, are not thereby made officials of the government. Defendants' force was exerted only against producers in various localities. Defendants thereby may have violated local laws. With that we have nothing to do. Federal crimes exist only by virtue of federal statutes; and the lawmakers owe the duty to citizens and subjects of making unmistakably clear those acts for the commission of which the citizen or subject may lose his life or liberty. Section 6 should not be enlarged by construction. Its prima facie meaning condemns force only when a conspiracy exists to use it against some person who has authority to execute and who is immediately engaged in executing a law of the United States.

Baldwin v. Franks, 120 U. S. 678, 7 Sup. Ct. 656, 32 L. Ed. 766, is the leading case. By a treaty between China and the United States Chinese persons were guaranteed certain civil rights in the United States. That treaty was a part of the supreme law of our land. In pursuance of a conspiracy, Baldwin, by force exerted upon the bodies of certain Chinese persons, prevented them from enjoying the rights guaranteed by the treaty. Section 6, the court said,

"means something more than setting the laws themselves at defiance. There must be a forcible resistance of the authority of the United States while endeavoring to carry the laws into execution. * * * His [Baldwin's] force was exerted against the Chinese people, and not against the government in its effort to protect them."

We conclude that no case was made under count 1.

[5] Similar attacks were made upon the case under count 2. This count is based on section 19 of the Penal Code (Comp. St.

§ 10183), which denounces conspiracies to injure citizens of the United States in the exercise of any "right or privilege secured to him by the Constitution and laws of the United States."

Defendants were charged with conspiring to prevent, by strikes and sabotage, such of the producers described in count 1 as were citizens from fulfilling their contracts with the government for war munitions and supplies. To produce, to sell, to contract to sell to any buyer, are not rights or privileges conferred by the Constitution and laws of the United States. If the buyer is an agent of the United States, he needs a federal law to qualify him as a buyer; but the producer and seller is exercising only such rights as antedated federal law, were not included in the grants of power in the Constitution (except to the extent that his product comes under federal taxation, regulation of interstate commerce, and the like), and were expressly reserved by the Tenth Amendment. Foreign governments, foreign and domestic corporations, individuals who were not citizens, all sold war supplies to our government, equally with citizens. No case was made under count 2. United States v. Cruikshank, 92 U. S. 542, 23 L. Ed. 588; United States v. Lancaster (C. C.) 44 Fed. 885, 10 L. R. A. 333; Lackey v. United States, 107 Fed. 114, 46 C. C. A. 189, 53 L. R. A. 660; United States v. Eberhart (C. C.) 127 Fed. 254. If Congress, under its war power, had limited the production of war supplies to citizens, there would be an analogy to United States v. Waddell, 112 U. S. 76, 5 Sup. Ct. 35, 28 L. Ed. 673, wherein homestead entry of public lands was limited to citizens.

Common to the case under counts 3 and 4 are assignments on rulings made prior to the trial. On September 5, 1917, agents of the Department of Justice raided the offices of the I. W. W. in various cities and seized their files of correspondence, together with copies of newspapers and pamphlets. The greater part was taken in Chicago from the general headquarters in charge of Haywood. The affidavits, on which the search warrants issued, failed to describe the property to to be taken except by reference to its general character, and failed to state any facts from which the magistrates could determine the existence of probable cause. If the proper parties had made prompt application, it may be assumed that they would have obtained orders quashing the writs and restoring the property. Veeder v. United States, 252 Fed. 414, 164 C. C. A. 338. If, following restoration, Haywood and others were adjudged to be in contempt for refusing to obey subpœnas and orders of court to produce the files and documents before the grand jury, it may be assumed that such judgments would be reversed. Silverthorne Lumber Co. v. United States, 251 U. S., 385, 40 Sup. Ct. 182, 64 L. Ed. 319. Nothing of the sort occurred. Government attorneys, without objection or hindrance, used the property as evidence before the grand jury. Indictment was returned on September 28, 1917. In February, 1918, defendants petitioned the court for an order to return the property, and the government moved for an impounding order. In March, 1918, defendants moved to quash the indictment on the ground that evidence illegally obtained had been used before the grand jury. From defendants' verified motions to re-

268 F.—51

turn the property and to quash the indictment, from the government's verified motion to impound, and from the property then in court, there was a sufficient basis of facts to justify the trial judge in finding that there was probable cause to believe that the property, particularly identified, had been used in the commission of the felonies described in counts 3 and 4. Motions to return the property and to quash the indictment were overruled, and the motion to impound was sustained. The trial lasted from the middle of April to the middle of August, 1918. Repeatedly during the trial the defendants objected and excepted to the admission of such property in evidence.

The Fourth Amendment reads:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."

[6] Part of the Fifth Amendment is as follows:

"Nor shall any person * * * be compelled in any criminal case to be a witness against himself."

Defendants claim that by the doings and rulings hereinabove recited both of these safeguards were broken.

From the thirteenth to the middle of the seventeenth century the Ecclesiastical Courts of England and during the later part of the period the Courts of Star Chamber and of High Commission compelled defendants to testify respecting criminal charges against them. During the last century of our colonial period the principle that no person shall be compelled in a criminal case to be a witness against himself had become a fixed part of our inheritance. And it was that fixed and definite meaning that in clearest terms was incorporated in our federal Bill of Rights. "Witness" is the key word. Constitutional safeguards should be applied as broadly as the wording, in the historical light of the evil that was aimed at, will permit; and so a defendant is protected not merely from being placed on the witness stand and compelled to testify to his version of the matters set forth in the indictment; he is protected from authenticating by his oath any documents that are sought to be used against him; he is protected from producing his documents in response to a subpœna duces tecum, for his production of them in court would be his voucher of their genuineness; he is protected from an act of Congress (Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746) declaring that the government's statement of the contents of his documents, if he fail to produce them on notice, shall be taken as confessed. But unless the origin and purpose of the command be disregarded and the key word be turned into an unintended, if not impossible, meaning, no compulsion is forbidden by the Fifth Amendment except testimonial compulsion. At the trial of this case no defendant was compelled in any way to become a witness against himself or against any of his alleged co-conspirators. Letters, pamphlets and other documents, identified by other witnesses, were competent evidence; and the trial judge, correctly

finding them competent, was not required to stop, and would not have been justified in stopping, the trial to pursue a collateral inquiry into how they came to the hands of government attorneys. Consequently there was no violation of defendants' rights under the Fifth Amendment. Adams v. New York, 192 U. S. 585, 24 Sup. Ct. 372, 48 L. Ed. 575; Rice v. United States, 251 Fed. 778, 164 C. C. A. 12; Laughter v. United States, 259 Fed. 94, 170 C. C. A. 162; MacKnight v. United States (C. C. A.) 263 Fed. 832; Wigmore on Evidence, vol. 3, §§ 2250, 2251, 2263, 2264.

[7] If defendants had done nothing but object to the introduction of the documentary evidence at the trial, no further constitutional question would be involved. But prior to the trial they had moved for a return and had resisted the government's motion to impound. And Weeks v. United States, 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177, is authority for holding that, if the court erred in impounding the documents and in refusing to return them to defendants, the present judgment must be reversed, because, if the documents had been returned to defendants, they would not have been available to the government at the trial, they could not have been obtained under a subpœna duces tecum, and the government would have been compelled to begin anew its effort to seize them.

Were the defendants' rights under the Fourth Amendment violated by overruling their motions for a return of the property? This safeguard had its origin at a different period and in a different evil from the period and evil out of which grew the Fifth Amendment. In the third quarter of the eighteenth century British officers, armed with general warrants or writs of assistance, were accustomed to invade the privacy of the homes of our colonial forefathers on blind fishing expeditions. Though the same evil at the same time was being resisted in England, the resistance on this side of the water was American resistance, and the harassing raids were a dominant cause of our revolt. This safeguard had its roots in American feeling and action; and it was not a mere bringing forward of an inherited principle that had been settled a hundred years before. Though the Fourth and Fifth Amendments stand side by side, each is as independent of the other as of any of the remaining safeguards in our federal Bill of Rights.

Not all searches and seizures are forbidden. Consider, first, the character of the property that may be seized. It has never been deemed unreasonable to hunt for and take stolen property, smuggled goods, implements of crime, and the like. Inasmuch as the documents in question were the tools by means of which the defendants were committing the felonies, there was no immunity in the nature of the property. Consider, next, the person whose privacy is invaded. If it be granted that the home of Burglar Smith, in which he has concealed the stolen goods and the implements of his crime, cannot lawfully be searched and the property seized, except under a warrant, based on an affidavit, particularly describing the place to be searched and the things to be seized, and stating facts from which the issuing

magistrate may properly find the existence of probable cause for believing that the stolen property and the implements of the crime are there concealed, it does not follow that Burglar Smith will be heard to complain that the Fourth Amendment has been violated by the forcible and unlawful breaking into the home of Burglar Jones and the seizure there of the stolen property and implements of crime of Burglar Smith. Each defendant moved for the return of property that had never been in his possession and was not taken from his person or home or place of business. When asked by the court to specify what property had been taken from each and how their several privacies had been invaded, they declined. In standing on their motions as made (and acceding to the court's suggestion would not have bettered their position) their theory was and now is that the I. W. W. was a partnership; that each partner, in possession of any document, was the custodian thereof for every other partner; that an unlawful invasion of the privacy of one effected a breach of the Fourth Amendment, available to all, severally and collectively. If the soundness of the contention respecting partners be conceded, the inquiry turns to the nature of the I. W. W. It was a voluntary association. It operated under a constitution and by-laws, quite as a corporation operates under a charter and by-laws. Its members at stated times elected officers for limited terms. On the retirement of any officer it was his duty under the by-laws to turn over to his successor the files, records and other property in his possession that pertained to the affairs of the organization. It was an association organized for purposes other than profit, and the payment of dues and fines by its members was merely incidental to carrying on its purposes. During membership or upon withdrawal no member had a proportionable proprietary or possessory right to any of its property or effects. In all of its contacts with the world, except commercial, it had the essential organization and method of a non-profit corporation. If it rented offices and bought furniture and failed to pay, the creditors might hold jointly and severally all the officers and members that could be found, because they could not show a corporate charter to shield them from personal liability. But in other respects the rights of the members should be measured by the essential attributes of the organization they had chosen to adopt. Otherwise they would be granted immunity by reason of their refusal to incorporate. Having explicitly agreed that they should not bear to one another the relation of partners, they cannot now insist that the court shall treat them as such. Niblack on Voluntary Societies, §§ 22, 116, 128; White v. Brownell, 2 Daly (N. Y.) 329; In re St. James Club, 13 Eng. L. & Ey. 529; Ostrom v. Greene, 161 N. Y. 353, 55 N. E. 919; Rohde v. United States, 34 App. D. C. 253. Defendants were indicted as individuals, not as members of the I. W. W. That organization was not on trial. In seizing the outlaw property of the I. W. W. organization, the officers of the government did not impinge upon the rights of any defendant under the Fourth Amendment. Consequently there was no error in impounding the property, overruling the motion for the return thereof, and refusing to quash the indictment.

Count 3 may be outlined thus: From May 18, 1917, to the returning of the indictment the United States was at war with Germany. During that period the defendants were members of the I. W. W., and they conspired to commit 10,000 offenses against the United States, each to consist of counseling, aiding, and abetting one of the 10,000 male persons, other members of said organization, who were eligible conscripts under the Selective Service Act of May 18, 1917, and who by the President's proclamation were required to register on June 5, 1917, but whose names are unknown, to fail and refuse to present himself for registration, and 5,000 other offenses, each to consist of counseling, aiding and abetting one of the 5,000 persons, still other members of said organization, who were eligible conscripts and who should register, but whose names are unknown, to desert the service. And in pursuance of the conspiracy defendants committed overt acts.

[8] Duplicity is the first objection. Defendants recognize that a single conspiracy may be formed to commit numerous offenses. Frohwerk v. United States, 249 U. S. 204, 39 Sup. Ct. 249, 63 L. Ed. 561. In form this count alleges one conspiracy to commit two groups of offenses of the same general character. But the urge of defendants is that a conspiracy formed on May 18, 1917, to counsel and aid members of the I. W. W. to fail to register on June 5, 1917, would come to end on the latter date; that a conspiracy to counsel and aid those members of the I. W. W. who should in fact register on June 5, 1917, to desert the service, could not be formed until on or after that date; and that, therefore, though in form of allegation there is but one conspiracy, in substance and of necessity two separate and distinct conspiracies are included in the same count. The validity of this conclusion depends on the truth of the premise that a conspiracy to counsel and aid desertions could not be formed until after members of the I. W. W. had registered. In Friedman v. United States, 236 Fed. 816, 150 C. C. A. 653, an indictment was upheld that charged a conspiracy to conceal assets from a trustee thereafter to be appointed in an impending bankruptcy proceeding. If, therefore, a conspiracy can be formed and an overt act committed to frustrate an anticipated situation, the counseling and aiding of desertions could be included in the conspiracy formed prior to June 5, 1917, as one of the objects thereof, along with the other object of counseling and aiding refusals to register; and it is manifest that both objects might be forwarded by the same acts and utterances. When the object of counseling and aiding refusals to register came to an end, the conspiracy, unless abandoned, would continue while the object of counseling and aiding desertions remained alive.

[9] Contention is made that the count is bad because the overt acts set forth do not appear on their face to have had any tendency to effectuate the objects of the conspiracy. We think they had. But it is not necessary that the pleading should show the particular way the overt act furthered the conspiracy. Frohwerk v. United States, 249 U. S. 204, 39 Sup. Ct. 249, 63 L. Ed. 561.

[10] Defendants finally assert that the count is void for uncertainty

in that the persons whom the defendants were to counsel and aid were not separated from the general mass. They were identified by class as being those eligible conscripts who were members of the I. W. W. The grand jurors did not know their names. Defendants were alleged to be members of the I. W. W. We think the count disclosed to them the offense with sufficient particularity.

Count 4 charged a conspiracy and the commission of overt acts to cause insubordination in the military and naval forces and to obstruct the recruiting and enlistment service in violation of the Espionage Act—

"by means of personal solicitation, of public speeches, of articles printed in certain newspapers circulating throughout the United States (here 12 are designated by name), and of the public distribution of certain pamphlets (here the titles of 3 are given), the same being solicitations, speeches, articles and pamphlets persistently urging insubordination, disloyalty and refusal of duty in said military and naval forces and failure and refusal on the part of available persons to enlist therein."

[11] Every element of the offense is in some way mentioned by the pleader. The point is made that he should have set out the newspaper articles either verbatim or in substance, and that neither was done. In view of Williamson v. United States, 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278, Aczel v. United States, 232 Fed. 652, 146 C. C. A. 578, Lew Moy v. United States, 237 Fed. 50, 150 C. C. A. 252, and Jelke v. United States, 255 Fed. 264, 166 C. C. A. 434, defendants do not question that the solicitations and speeches were adequately identified. If the wording, that the solicitations and speeches were persistent urgings of insubordination and refusal to enlist, is not the mere opinion or conclusion of the pleader, but is in fact a statement of their purport, the same wording should be accepted as a statement of fact in regard to the newspaper articles. Among the overt acts set forth in the count several articles from the aforementioned newspapers, with date of issue, page and column specified, were copied verbatim. These would help to inform the defendants of the exact nature of the charge against them. As we do not intend to cumber this page with copies, we can do no better than the pleader did in setting out their substance: The articles persistently urged insubordination, disloyalty and refusal of duty in the military and naval forces and failure and refusal on the part of available persons to enlist therein.

Most of the assignments concerning the admissibility of evidence and the correctness of the court's instructions have disappeared by reason of the holding that no case was pleaded and proved under either count 1 or count 2.

[12, 13] Under counts 3 and 4 numerous objections were made on the ground that the matters offered in evidence antedated the passage of the Selective Service Act and the Espionage Act. If the court erred in admitting them on the ground that they had probative force in establishing the criminal intent charged in these counts, the ruling was harmless if the matters were in fact admissible on any ground. We agree at once (Kammann v. United States, 259 Fed. 192, 170 C. C. A. 260) that criminality cannot be proved by proving innocence. There

is a rule that, in certain classes of cases, the criminal intent charged in the indictment may be made out, or at least supported, by proof of the commission of similar prior offenses. But the terms of the rule require that the prior matters be offenses when committed. To illustrate: Take a time when malicious and premeditated homicide was not unlawful. During that time a person with premeditated malice takes the life of a human being by means of a certain poison. Because he has committed no crime, it is impossible that he should have had any criminal intent. Later a murder law is enacted. Under it the same person is charged with having taken, feloniously and with premeditated malice, the life of a human being by means of the same poison. Presumptively he is innocent. Presumptively he intended, when the murder law was enacted, to respect and obey it. Against the presumption that he did not have the criminal intent to commit murder, the prior innocent homicide has no probative value. But that does not mean that matters in connection with the innocent homicide have no probative value for other purposes in the murder case. Just prior to the innocent homicide this person had in his possession a large quantity of the particular poison. Possession, once established, is presumed to continue. This would bear on his possession, at the time of the alleged murder, of the means by which the murder was accomplished. In committing the innocent homicide this person learned that this particular poison would cause death quickly but in a way that might be mistaken for the result of a natural ailment. Knowledge, once established, is presumed to continue. This would bear on his knowledge of the use and efficacy of the means at the time of the alleged murder. But knowledge of the use and possession of the means by which murder may be committed are matters quite apart, in our judgment, from the intent to commit murder.

[14] Evidence of the organization of the I. W. W., the defendants' control, and the methods of operation through correspondence, pamphlets and official newspapers, was competent, though antedating the laws in question, as bearing on defendants' possession and knowledge of the use of the means by which these felonies could be committed. Furthermore, the presumption of continuing possession and knowledge was fortified by evidence of the same conditions down to the time of the indictment.

[15] Newspaper articles and pamphlets, printed before the statutes in question were passed, were rendered competent by proof of their use within the indictment period.

[16] Correspondence, newspaper articles and pamphlets, antedating the statutes, but contemplating their passage and declaring the purpose to violate and obstruct them when passed, were of course admissible as bearing directly upon criminal intent.

If these groupings do not cover all of the objections to the evidence under counts 3 and 4, we regard the remainder as of trivial consequence. We find such an abundance of clear and competent evidence within the indictment period that we believe the verdict was inevitable. Some of the defendants claim that there was no evi-

dence connecting them with the conspiracy, except the fact that they were members of the I. W. W. And several, who were not members at the time, insist that there is no evidence against them at all. In each such case our finding is that there was sufficient evidence on which to submit to the jury the question whether the particular defendant was a member of the established conspiracy.

We find no abuse of the trial court's discretion controlling the scope of the cross-examinations of witnesses.

We find no error in the charge to the jury, and it adequately covered all of defendants' proper requests for instructions. The law of conspiracy under the statutes of the United States has been so frequently and recently expounded in decisions of the Supreme Court and the Courts of Appeals that further repetition is deemed unnecessary.

In the case of each defendant the judgment is modified by striking therefrom the imprisonments and fines assessed under counts 1 and 2; and, as so modified, the judgment is

Affirmed.