## UNITED STATES v. ASHWORTH.

Second Division.  Nome.  June 23, 1923.

No. 1105-C.

**1. Criminal law ⟞395—Searches and Seizures—Intoxicating Liquor—Evidence.**

A police officer entered a bawdyhouse to search for stolen property. The doors were opened by the female occupant, who was then in state of intoxication. A deputy United States marshal accompanied the policeman at his request, though the deputy marshal had no official duty, as such, to perform. The police officer informed the woman that he was searching for stolen property, whereupon she said to the officers, "Go as far as you like." While conducting the search for the stolen goods, the officers saw a keg, which the policeman examined and tasted its contents, which he found to be whisky. The deputy marshal thereupon told the policeman he would go and get a search warrant to search the place for intoxicating liquors. Upon making an affidavit to these facts before a magistrate, a search warrant was issued, the premises were searched, the liquor in the keg seized, the woman arrested for violation of the prohibition law, and she was tried before the magistrate and found guilty of having intoxicating liquor in her possession. On appeal to the district court the defendant moved to quash the search warrant, and petitioned for return of the keg of liquor seized by the deputy marshal. *Held*, the search by the policeman and deputy for stolen goods was being conducted under the municipal law, the liquor was accidentally found in that search, the search warrant was rightfully issued, the liquor was not seized in violation of the Fourth Amendment to the Constitution, the motion to quash and the petition to return were both denied, and the evidence admitted.

**2. Searches and Seizures ⟞7(16)—Constitutional Law—Bawdyhouses—Criminal Law.**

A public bawdyhouse, one declared to be a nuisance by the municipal law, is not a "house" within the protection and meaning of the Fourth Amendment to the Constitution, nor is it a "private dwelling," within the protection and meaning of the Volstead Act (27 USCA). It is a public place, subject to the quasi visitatorial powers of the police authorities.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, House; Private Dwelling.]

Appeal from judgment of the United States commissioner's court in and for Cape Nome precinct, Second division, terri-

⟞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tory of Alaska, on a conviction of defendant under the "Bone Dry Law" of Alaska (48 USCA §§ 261–269 [U. S. Comp. St. §§ 3643b–3643r]), for having intoxicating liquors in her possession. Motion to quash search warrant overruled; petition for return of property seized denied in part and granted in part.

Hugh O'Neill, of Nome, for petitioner.
W. Fred Harrison, U. S. Atty., of Nome.

LOMEN, District Judge. The motion and petition were heard pending the trial of the criminal action, and were argued together. The grounds of the motion were: (a) Indefiniteness in description of the premises searched; (b) want of probable cause for the warrant; (c) that the facts stated in the petition were false; (d) that the Fourth Amendment to the Constitution had, immediately before the issuance of the warrant, been violated by an illegal search.

The petition, so far as material, alleges that on the 30th day of April, 1923, while the defendant was "ill" in her residence, one W. W. Getchell, a deputy United States marshal, "acting as such deputy marshal," together with one B. W. Neilly, who was then and there a police officer of the city of Nome, and "acting as such officer," unlawfully and without warrant or authority so to do, "broke open" the door to defendant's said "home" and seized certain property in said home (describing the property), and that said property is now held by the United State attorney, the United States marshal, and the United States commissioner, for the purpose of using the same in evidence on the trial of the criminal action. The petition asks for a return of the property seized.

The answer to the petition denies the material allegations of the petition and claims the liquors and containers as contraband goods forfeited to the United States. Omitting the formal parts, the affidavit, on which the search warrant issued, was as follows:

"W. W. Getchell, being first duly sworn, on oath, deposes and says: That he is a deputy United States marshal in and for the Second division, territory of Alaska; that as such deputy United States marshal he did on the 30th day of April, 1923, at the request of one B. Neeley, a police officer of the city of Nome, accompany the said B. Neeley to a certain building, in the restricted district of the city of Nome, occupied by one Kitty Doe, whose real name is unknown to this affiant, which said building backs on Second avenue, between Lane's

7 A.R.—5

Way and Hunter Way, in the said city of Nome, territory of Alaska, for the purpose of assisting the said B. Neeley in the execution of a certain warrant in the hands of the said Neeley; that while in said house of the said Kitty Doe, whose real name is unknown to this affiant, he noticed a liquor keg, which, from the odor emanating from the same, contained intoxicating liquor. Wherefore affiant makes application for the issuance of a search warrant for the search of the said premises, and its appurtenances, above described, directed to the United States marshal of the Second judicial division, territory of Alaska, or any of his deputies, commanding them to search the said premises for intoxicating liquors of whatever nature, and to bring the same to this court to be disposed of and dealt with according to law."

Attached to the warrant issued on said affidavit was a copy of said affidavit, and also of a note from Fred Harrison, United States attorney, directed to C. W. Thornton, United States commissioner, stating:

"One or more persons, who are competent witnesses, having charged on oath or affirmation before me that the facts set forth in the herein annexed affidavit are true, and being satisfied that there is probable cause to believe that the grounds set forth in said affidavit are true, said affidavit is hereby approved, and you are respectfully requested to issue a search warrant, as therein requested."

The search warrant issued by the commissioner on said affidavit and direction of the United States attorney recites:

"Information on oath having this day been laid before me by one W. W. Getchell, United States deputy marshal, in the form of a sworn complaint, of which the annexed is a true copy: You are therefore hereby commanded, at any time in the day or night, to make immediate search of that certain building situate in the restricted district of the town of Nome, occupied by the said Kittie Doe, whose true name is unknown, which said building backs on Second avenue, between Lane's Way and Hunter Way, in the said town of Nome, territory of Alaska, and its appurtenances, for the following: Intoxicating liquors, and, if you find any intoxicating liquors, to bring the same forthwith to me at Nome, Alaska, to be disposed of and dealt with according to law."

Thereafter, and on the same day, said United States commissioner also, on the complaint of said W. W. Getchell, issued a warrant for the arrest of said defendant.

On the hearing of the petition herein, W. W. Getchell and B. W. Neilly were each called as witnesses for the petitioner. They testified in effect that on the 30th day of April, 1923, one Geissler accosted said Getchell and informed him that he had

lost his pocketbook, containing valuable papers and money, but did not know the circumstances of the loss or the place where he had lost his property. Said Geissler expressed the belief that it might be found in the possession of the defendant, who conducts a bawdyhouse in the so-called "restricted district" in Nome, and he requested Mr. Getchell to assist him in the recovery of his property. Mr. Getchell, regarding the matter as one of local municipal concern, rather than a matter for federal intervention, proceeded with said Geissler to Chief of Poice Haughey, who called Mr. Neilly, also a police officer, and Mr. Neilly undertook to investigate the matter, if Mr. Getchell would accompany him. They proceeded to the bawdyhouse referred to, found the outside or shed door open, and walked in. The door to the adjoining room, a kitchen, was also found open, and they entered said room. The door leading from the kitchen was found closed, or nearly so. Mr. Neilly turned the knob and opened the door, and they walked into what appeared to be a bedroom. A second door leading from said bedroom was found locked. Mr. Neilly knocked on the latter door. The defendant answered from the adjoining room and inquired, "Who is there?" Neilly answered, "Neilly, the police officer." She said, "Who else is there?" he said, "A deputy marshal." Then she opened the door. Mr. Getchell stepped back into the bedroom, which smelled of liquor, and there saw a keg, the contents of which he and Neilly later tasted and found to be whisky. Getchell then told Neilly that he "had gone as far as he could; that he was going to get a search warrant to search the place for liquor."

Getchell testified that he was not there in his official capacity, but that he told Mr. Neilly to see that nothing was disturbed in the house until he got back with the search warrant. It appears, further, that the defendant was at the time "in a beastly state of intoxication." Being informed of their errand, she stated to the officers that she did not have the pocketbook and knew nothing about it. When Neilly suggested a search for the lost property, she said, "Go as far as you like." Neilly and Getchell thereupon made a search for the pocketbook. In the presence of the defendant they opened some drawers of a bureau and rummaged about, and looked through the rooms. It was then that they tasted of the contents of the keg, and Getchell said he would get a warrant.

No property right is claimed by the defendant in the liquors. The evident purpose of the motion and petition is to prevent their use in evidence.

The principal questions presented and argued at the hearing were an alleged illegal search and seizure of the intoxicating liquors, and a consequent violation of the Fourth Amendment to the Constitution, and a threatened violation of the Fifth Amendment by the use of said liquors as evidence against defendant on the trial of the criminal action.

The attorney for the defendant presented and relied upon the following authorities: Boyd v. U. S., 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746; Gouled v. U. S., 255 U. S. 299, 41 S. Ct. 261, 65 L. Ed. 647; U. S. v. Kelih (D. C.) 272 F. 484; Dukes v. U. S. (C. C.) 275 F. 142; U. S. v. Mitchell (D. C.) 274 F. 129; U. S. v. Kraus (D. C.) 270 F. 578; Weeks v. U. S., 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177; Adams v. N. Y., 192 U. S. 585, 24 S. Ct. 372, 48 L. Ed. 575; State v. Peterson, 27 Wyo. 185, 194 P. 342, 13 A. L. R. 1284, 1289; People v. Mayen, 188 Cal. 237, 205 P. 435, 24 A. L. R. 1383; Youman v. Kentucky, 189 Ky. 152, 224 S. W. 860, 13 A. L. R. 1303; Ex parte Jackson (D. C.) 263 F. 110.

The United States Attorney cited the followng cases: U. S. v. Fenton (D. C.) 268 F. 221; McBride v. U. S. (C. C. A.) 284 F. 416; Glennon v. Britton, 155 Ill. 232, 40 N. E. 594; Pasch v. People, 72 Colo. 92, 209 P. 639; N. C. Co. v. Brenneman (C. C. A.) 259 F. 514; U. S. v. O'Dowd (D. C.) 273 F. 600; Burdeau v. McDowell, 256 U. S. 465, 41 S. Ct. 574, 65 L. Ed. 1048, 13 A. L. R. 1159; U. S. v. Bateman (D. C.) 278 F. 231; U. S. v. Snyder (D. C.) 278 F. 650; Elrood v. Moss (C. C. A.) 278 F. 123; Kathriner v. U. S. (C. C. A.) 276 F. 808; People v. Marxhausen, 204 Mich. 559, 171 N. W. 557, 3 A. L. R. 1509; Adams v. New York, 192 U. S. 585, 24 S. Ct. 372, 48 L. Ed. 575; Wigmore on Evidence, § 2264; People v. Mayen, 188 Cal. 257, 205 P. 435; U. S. v. Slusser (D. C.) 270 F. 818; Flagg v. U. S. (C. C. A.) 233 F. 481.

We have carefully considered the cases cited in the briefs of counsel. It may be incidentally observed that the Peterson Case, ante, was overruled in the Lanza Case, post; that the Snyder Case, ante, was reversed in (C. C. A.) 285 F. 1; and that the Bateman Case, ante, was disapproved in U. S. v. Kap-

lan (D. C.) 286 F. 963. The Boyd, Weeks, and Gouled Cases have been distinguished in the case of Essgee Co. of China v. U. S., 262 U. S. 151, 43 S. Ct.·514, 67 L. Ed. 917, decided May 7, 1923. None of the cases cited touch upon the restraint of powers exercised by the national government in a territory of the United States.

In considering the questions presented, the court takes note of the fact that the Eighteenth Amendment and the Volstead Act (27 USCA) as well as the Bone Dry Law of Alaska, are operative here.

Both of said acts cover practically the same subject-matter, emanate from the same sovereignty, and are in some respects overlapping and inconsistent. By the terms of section 3530, U. S. Compiled Stat. (48 USCA § 23), "the Constitution * * * and all * * * laws" of the United States, *"not locally inapplicable,* shall have the same force and effect within the * * * territory as elsewhere in the United States." The National Prohibition Act extends throughout the territory of the United States, and provides that "all provisions of law that are inconsistent with this act are repealed only to the extent of such inconsistency, and the regulations herein provided for the manufacture or traffic in intoxicating liquor shall be construed as *an addition* to existing laws." Section 35, tit. 2; 41 Stat. 317 (27 USCA § 52).

In the case of Abbate v. U. S., 270 F. 735, followed in Koppitz v. U. S. (C. C. A.) 272 F. 96, it was held by the Circuit Court of Appeals, Ninth Circuit, that the Bone Dry Law of Alaska was not repealed by the National Prohibition Act, and was to be regarded as *"a special or local act"* and given the effect of "establishing an *exception* to the general" or National Prohibition Act. (Italics ours.) It was also said that "in legislating for a territory Congress exercises the combined powers of a national and a state government," and that "the Bone Dry Law of Alaska remains in force, just as do the prohibition laws of the states, and the National Prohibition Act, although in force in all jurisdictions, affects no' more the Alaskan act than it does the state acts." The decision in this case is binding upon this court. It was to the effect that the penalty provided for in the Bone Dry Law was not repealed, and the penalty provided for in the National Prohibition Act was not substituted.

A later decision of the Supreme Court of the United States,

the case of United States v. Lanza et al., 260 U. S. 377, 43 S. Ct. 141, 67 L. Ed. 314, decided December 11, 1922, October term, 1922, discussing the concurrent jurisdiction of the state and federal courts, and the concurrent powers of Congress and state Legislatures, under the Eighteenth Amendment to the Constitution, makes it plain that a distinction must be drawn between cases arising in the states and those arising in Alaska. In this territory, although both the Bone Dry Law and the National Prohibition Act are in operation, and, while the former act is more strict and provides for additional offense and a more severe penalty, we do not understand that the Abbate Case goes so far as to hold that in the territory a person could be prosecuted under *both acts for the same offense.* These laws, unlike those of the state and federal government, emanate from the same sovereignty, and the cases arising under them would necessarily be tried in the same courts. The rule of "twice in jeopardy" would probably apply.

The Lanza Case raises the query whether the two acts applicable to Alaska are not amenable to the further objection, suggested in that case, not of the "race" therein mentioned, but of possible favoritism in the application of the law. If, for the reasons above stated, a prosecution cannot be had under both acts, the concurrent operation of the two acts would seem to place in the hands of the prosecuting officer the power to determine which of the two acts he would proceed under, and which of different penalties provided for might be imposed for the same act, making uncertain the penalties, making them depend upon his will, and thus create a condition of *government by men and not by law,* violative of our best traditions. A distinction between the legislation in the states and that for the territory must therefore be drawn.

The laws applicable to Alaska, in the matter of searches and seizures, are also different in the two acts. The National Prohibition Act places greater limitations upon the powers of federal officers in this matter than does the Bone Dry Law. The powers of the federal government are greater, less limited, in the territory than in the states. Searches of private dwellings are not limited to the same extent in the Bone Dry Law as in the National Act. Search warrants under the former act may issue more generally than under the latter, and " * * * to search said described room, house, building, or other place, and

the appurtenances" (section 17 [48 USCA § 278; U. S. Comp. St. § 3643j]), or, as said in section 2486, Compiled Laws, "any place in the district." It is not necessary under the Bone Dry Law to specify the particular kind of liquor in the warrant, information, or indictment. The alcoholic liquor seized is made prima facie evidence of the violation of the provisions of the act. The house or building in which alcoholic liquors are stored is declared to be a nuisance. "The evidence of having or keeping them [the liquors] in hand, * * * shall be sufficient to convict." "No property right of any kind shall exist in alcoholic liquors," and the same "may be searched for and seized." Whether with or without warrant the statute does not specifically say. Sections 17, 18, 19, 23 (39 Stat. 906–908 [48 USCA §§ 278–280, 284; U. S. Comp. St. §§ 3643j–3643k, 3643m]).

However embarrassing it may be to the courts to apply and distinguish the different provisions in the National Prohibition Act and of the Bone Dry Law, it must be done so long as both are permitted to operate in Alaska. It would seem that, since the adoption of the Volstead Act, the Bone Dry Law in Alaska has served its usefulness, unless Congress deems that more drastic legislation is necessary in the territory than in the states. The territorial Legislature has declared houses of ill fame to be nuisances. Chapter 20, § 2, Laws 1919.

The courts have held that the Fourth Amendment must be construed in the light of the Eighteenth Amendment. There was no need of the latter amendment, so far as federal power in Alaska was concerned; plenary powers already existed there. We have found no decision directly holding that the Fourth Amendment is "applicable" to Alaska, although the Fifth, Sixth, and Seventh Amendments have been held to be. Rasmussen v. U. S., 197 U. S. 516, 25 S. Ct. 514, 49 L. Ed. 862. The Fourth Amendment relates to, and restricts, the sovereignty of the nation, unaffected by any sovereignty in the states or by the people thereof. It does not necessarily restrict the powers of the government as exercised in the territory. When it is exercised in the states, it is exercised under specially delegated and federal powers; when exercised in Alaska, "the powers are general and residuary, in character"—municipal, or both federal and municipal, according to the power exercised. 11 M. A. L. 172. The national government may there "determine the civil

status of the inhabitants, grant or refuse the privilege of citizenship, extend or withhold political rights, and regulate the rights of persons and property." Id. 173.

It is possible, therefore, that the term "the people," as used in the Fourth Amendment, is to be taken in its "legal sense," defined by Judge Cooley in his work on Constitutional Limitations to be "those who, by the existing Constitution, are crowned with political rights." Koehler v. Hill, 60 Iowa, 543, 14 N. W. 738, 15 N. W. 609, 615; Words and Phrases, First and Second Series, "People." The people crowned with such rights are not the inhabitants of Alaska. See article III, Treaty of Cession. When it is conceded that the powers of state officers are not restricted by the Fourth Amendment, that its restrictions apply only to federal agencies, is it not reasonable to hold that, when exercising municipal or police powers in a territory, the national government, having there sole and supreme territorial jurisdiction, could authorize its officers to exercise powers equal to those exercised by state officers under like circumstances? If such power be wanting, it is not expressly limited or restricted by the Fourth Amendment, nor in other provisions of the Constitution. It certainly was not reserved by the states or the people thereof. They could exercise no power in the territory; nor was the power expressly limited or restricted as to or reserved to the inhabitants of Alaska—they had no power, except in the respect, and to the limited extent, provided for by Congress itself.

Cooley, in his Constitutional Limitations, has laid down the proposition, as we understand it, that the federal government, in acting for the territories, acts upon the latter under general powers in the same manner as the states act upon counties and cities, and that their acts are municipal in character, and special, not delegated or federal. This is also the effect of the ruling in the Abbate Case, supra. Without so holding, this would eliminate the idea of the Bone Dry Law being a federal act, or the enforcement thereof, by public officers, federal acts, and the Fourth Amendment, because a restriction only on federal powers, would not apply. It is certain that the powers of Congress in legislating upon the subject in Alaska were not derived from the Eighteenth Amendment, as they necessarily were with reference to legislation covering the states. Cooley, Const. Lim., at page 4 of his fifth edition, says:

"Indeed, the term 'unconstitutional law,' as employed in American jurisprudence, is a misnomer, and implies a contradiction; that enactment which is opposed to the Constitution being in fact no law at all. But where, by the theory of the government, *the exercise of complete sovereignty is vested in the same individual or body which enacts the ordinary laws,* any enactment, being an exercise of power by the sovereign authority, must be obligatory, and, if it varies from or conflicts with any constitutional principle, it must have the effect to modify or abrogate such principle, instead of being nullified by it."

Thus it is in England, and may be so with regard to the powers exercised by the nation in nonfederal matters in the territories. However, we do not find it necessary to pass upon the question in this case.

Even conceding that "the spirit of our institutions" clothes the people of Alaska with the same protection that the people of the states enjoy in respect to the agencies of the federal government, this is not so by reason of the Constitution operating directly, but by reason of the action of Congress. The latter has extended the Constitution only so far as applicable. Is a self-imposed limitation "applicable"? In any event, we are not prepared to hold, upon the facts of the instant case, that the amendment or its spirit apply. In the first place, the government, so far as it has acted, has done so in a municipal and not a federal capacity. The deputy marshal, Mr. Getchell, was not functioning as an agent of the government, whether federal or municipal, at the time of entering defendant's premises, or when he discovered the keg or the intoxicating liquor contained therein—whatever duties he may have performed after the issuance of the warrant. This, of course, depends upon his authority at the time and the purpose of his visit. If he was not acting upon federal authority, and if his purpose and conduct were lawful, surely defendant cannot complain. Nothing seems to have been done by force or against her will. She herself opened the door when it was knocked upon, after being informed who the "officers" were. She herself consented to a search for the pocketbook; said to them, "Go as far as you like." The discovery of the keg was purely accidental and an incident to said search. The "officer," or a private citizen, could then and there have arrested the defendant, because of a crime committed in his presence, and made further search. Compiled Laws of Alaska, §§ 2391, 2399, 2404. That he proceeded in a more regular way, and, after making the discovery, swore out

warrants, and under them made further search and arrested the defendant, should not give reason for complaint. No deception was practiced. Surely his previous acts could not be a bar to the further proceedings. To so hold would be to shield criminals beyond all reason, and to torture "the spirit of our institutions" to an unworthy end. It has been contended that Mr. Getchell could not, and did not, act extraofficially when he went to the cabin of the defendant.

Let us see what the office and powers of a deputy marshal are. Section 9 of the Act of June 6, 1900, 31 Stat. L. 324–5 (48 USCA § 110 [U. S. Comp. St. § 3569]) provides that, when "in the opinion of the Attorney General the public interest requires it, he may, on the recommendation of the marshal, which recommendation shall state the facts as distinguished from conclusions, showing necessity for the same, allow the marshals to employ necessary office deputies and clerical assistants, upon salaries to be fixed by the Attorney General, from time to time." The deputy marshal is required to take an oath "to faithfully execute all lawful precepts directed to the marshal of the district, under the authority of the United States, and true returns make, and in all things well and truly, and without malice or partiality, perform the duties of the office of deputy United States marshal." Rule 87, Instructions to Marshals, authorized under law, provides:

"The marshal is responsible for the acts of his deputies and should therefore exercise great care in their selection."

The court takes judicial notice of the fact that Mr. Getchell was an office deputy. Rule 106 provides:

"Office deputy marshals, in addition to the work of the office, shall serve the process of the courts and perform such other duties as may be directed by the marshal."

Rule 110 provides:

"The deputy marshals shall be ex officio constables and executive officers of the commissioners herein provided for, and shall have the powers and discharge the duties of United States deputy marshals, and also those of constables, under the laws of the United States applicable to said district."

There can be no officer without an office, and no officer, unless he be charged with a duty and acts under such duty and agency from the state. See 46 L. R. A. 295 (Day's Case).

The liability of the marshal extends only to acts which the law requires the officer to perform, and not to acts entirely extraofficial and personal. 29 Cyc. and notes 9 and 10; Harrington v. Fuller, 18 Me. 277, 36 Am. Dec. 719; Lewark v. Carter, 117 Ind. 206, 20 N. E. 119, 3 L. R. A. 440, 10 Am. St. Rep. 40; Adams v. N. Y., 192 U. S. 585, 24 S. Ct. 372, 48 L. Ed. 575; State v. Mausert, 88 N. J. Law, 286, 95 A. 991, L. R. A. 1916C, 1014. We conclude, therefore, not only that it was possible for Mr. Getchell to act in an extraofficial capacity, but that he did so act in the matter complained of.

It will not be contended, and it has not been contended in this case, that Mr. Neilly was a federal officer, whose acts were within the purview of the Fourth Amendment. He was a city police officer, and derived his authority and powers from the city council of Nome, and not otherwise. Getchell, who was one of the defendant's witnesses, testified that, up to the time of securing the warrant in this case, he was assisting Mr. Neilly at his request and as a personal accommodation to the latter. He was not acting under any "precept" of the marshal, or acting under any "writ" of any court, and was not in search of liquors.

Much has been said in argument to the effect that the constitutional rights of the defendant were invaded by a forcible entry upon her "home," her "castle," against her will. The facts in evidence do not so show.

As to the question of defendant's "home" or private dwelling, it would hardly seem that her "house" was such as to hedge her about with any "divinity" or constitutional ægis. It is admitted that the house in question was a bawdyhouse, declared by statute to be a nuisance. Chapter 20, § 2, Session Laws of Alaska 1919, provides:

"Whoever shall erect, establish, continue, maintain, use, own or lease any building, erection or place used for the purpose of lewdness, assignation or prostitution or any other immoral· act, is guilty of maintaining a nuisance, and the building, erection or place, or the ground itself, either public or private, in or upon which, or in any part of which such lewdness, assignation or prostitution is conducted, permitted or carried on, continued or exists, and the furniture, fixtures, musical instruments and *contents* are also declared a nuisance, and shall be enjoined and abated as hereinafter provided."

This could not be done in regard to "houses" contemplated in the Fourth Amendment. Nor was the place a "private dwell-

ing" as defined in the Volstead Act. It was a nuisance, also, as defined in the Bone Dry Law. In cases of this kind we incline to the belief that a quasi visitatorial power rests in the police authorities—at least, this is generally exercised—or the place may be regarded as a public place.

The reputation of defendant herself, as testified to by Mr. Neilly, is that of a "woman of easy virtue." This would not justify the court in regarding her as a pariah, but we are reminded, as said by Cicero:

"The owner should be an ornament to the house, and not the house to the owner."

In this case, neither the house nor its owner can be considered an ornament, and a brothel can hardly be dignified by the appellation "home or private dwelling."

We have stated the facts in regard to the entry upon the premises, the circumstances under which it was made, and what transpired before the issuance of any warrants. Defendant's counsel drew from his witnesses the fact that the defendant at that time was "beastly intoxicated," and he argues that, by reason of such fact, she was incapable of giving consent to the admission of Getchell and Neilly, when they knocked upon her door, nor in a condition to consent to the search. We cannot agree to this. Drunkenness is no excuse. It has been held that under the law of contracts, if the drunken party was not imposed upon or taken advantage of, or if the drunkenness was not short of deprivation of reason, it will not excuse or relieve a party from his contract. If any other rule obtained, it would produce the greatest uncertainty, difficulty, and variety of decisions upon cases similarly circumstanced, and subject everything to the control of fluctuating opinions. Woodson v. Gordon, Peck (Ill.) 196, 14 Am. Dec. 743; Wade v. Colvert, 2 Mill, Const. (S. C.) 26, 12 Am. Dec. 652; Wigglesworth v. Steers, 1 Hen. & M. (11 Va.) 70, 3 Am. Dec. 602.

In case of negligence, or torts, the true rule is that voluntary drunkenness does not relieve the drunken person from the degree of care required of a sober man under the same circumstances. Bageard v. Consolidated Tract. Co., 64 N. J. Law, 316, 45 A. 620, 49 L. R. A. 424, 81 Am. St. Rep. 498.

The right to enter and search may be consented to. Windsor v. U. S. (C. C. A.) 286 F. 51.

We conclude that the same rule should be applied in regard

to the admission by the defendant of Neilly and Getchell into her house, and that her voluntary consent to the search cannot be taken advantage of by her, on the ground that she had no consenting mind, by reason of her voluntary drunkenness.

The defendant does not claim any ownership or interest in the intoxicating liquor seized or the containers thereof. Both under the Volstead Act and the Bone Dry Law such property is forfeited to the United States as soon as it comes into existence, and neither the facts stated in the petition for the return of the property nor the invalidity of the search warrant would entitle the defendant to a return of the property. U. S. v. Rykowski (D. C.) 267 F. 866, and other cases cited therein by counsel; U. S. v. Kaplan (D. C.) 286 F. 963.

The only point raised by the defendant in regard to the invalidity of the search warrant was the admitted false recital in the affidavit that Neilly was at the time of the alleged unlawful search armed with a warrant, and the further recital that the affiant, Getchell, "is a deputy United States marshal," and that, "as such deputy United States marshal," he did the acts set forth in the affidavit. Neither of said recitals, whether true or not, was material to the issuance of the search warrant, and such alleged facts, on defendant's own showing, that Mr. Getchell acted in private capacity, have no bearing upon the question of probable cause, which it was necessary to show before the warrant could issue. They disprove the facts alleged, that Getchell was at the time acting as such officer or on behalf of the United States. On the facts of this case we have reached the conclusion that there was no violation of the Fourth Amendment, and that defendant is not entitled to a return of the "contraband" property seized.

Each case must be heard and determined upon the facts and circumstances of the particular case, and analogy drawn from the decisions of the courts are often dangerous. There seems to be in some jurisdictions, state and federal, a dangerous extension and enlargement of the restrictions on federal agencies under the Fourth Amendment, giving the latter a construction which serves as a cloak for smart and unscrupulous violators of law, rather than protection to law-abiding citizens. It is also of the highest importance to distinguish between propositions and opinions of courts in cases that on the facts are similar, but not identical. Defendants, if it be to their advantage, are prone to

invoke protection under the Fourth Amendment, and, in doing so, are often satisfied with the roughest and broadest definitions between right and wrong. They see, or pretend to see, no shades of color between black and white; and to the rights of the public and the administration of justice they are indifferent. Thus it was that Samuel Johnson found occasion to say that "patriotism is the last refuge of the scoundrel," and Madame Roland said, "Liberty! Liberty! how many crimes have been committed in thy name!"

Again, as we have tried to show, there is a broad distinction to be made in this class of cases between those arising in the states and those arising in Alaska. The powers of the government are in each case far different. "Whilst confined to its constitutional orbit, the government of the United States is supreme within its lawful sphere." Downes v. Bidwell, 182 U. S. 244, 21 S. Ct. 770, 45 L. Ed. 1088. And in the exercise of its *police powers* in the territories we prefer to follow the authorities which hold that the search for and the seizure of intoxicating liquors are not *always* within the purview of the Fourth Amendment. Nor can we follow the decisions which hold that intoxicating liquors, forfeited to the United States the moment of their existence, can be held, when seized and introduced in evidence, to come within the purview of the Fifth Amendment, under the rule that "no person shall be compelled to be a witness against himself in a criminal action." Such evidence has no relation to the defendant, except as an instrument or ingredient of the crime, and such evidence to that extent "speaks for itself," and cannot be said to be a part of the testimony of the defendant, or "testimonial compulsion." Haywood v. U. S. (C. C. A.) 268 F. 795. "Witness" is the key word in the Fifth Amendment. Id. There is no real ad testificandum compulsion in such cases. Essgee Co. of China v. U. S. (Nos. 706 and 707) 262 U. S. 151, 43 S. Ct. 514, 67 L. Ed. 917, decided May 7, 1923. Nor can such "evidence" be considered to be held in any lawful private capacity. Id.

The Fourth Amendment does not require that all searches and seizures must be made upon warrant and probable cause, but contemplates searches and seizures that under the common law would be proper, and recognizes searches and seizures that are not "unreasonable." So, in this case, we think that Mr. Getchell at the time of the discovery of the liquor was not

searching for liquor and was not a trespasser. The discovery was made through his senses. The original discovery was legitimate. Because the arrest and seizure was not made upon the discovery of the crime, which then and there must be considered to be taking place in his presence, this could not, and did not, vitiate the legal proceedings subsequently adopted. No unlawful advantage had been taken. See Essgee Case, supra, It may also be observed that the provisions of the Volstead Act in regard to searches and seizures in private dwellings do not apply to proceedings under the Bone Dry Law, if the rule established in the case of Abbate v. U. S., supra, be followed. Furthermore, if, as was said in the case of First National Bank v. Yankton County, 101 U. S. 129, 25 L. Ed. 1046, "the federal government can do for the territories what the states can do for themselves," then, except as limited by statute, the officers of the federal government, or territorial officers, exercising their functions in the territories, might make searches and seizures that federal officers could not make in the states.

Again, the search warrant in this case was not issued for the arrest of the defendant, but for the purpose of seizing contraband liquor, under the Bone Dry Law. The criminality of the defendant was but indirectly involved in such warrant. Said warrant is now functus officio, and quashing it would not change the situation.

The searches and seizures were plainly authorized and adapted to constitutional ends, in view of the Eighteenth Amendment, and were certainly authorized and adapted to the ends contemplated by the Bone Dry Law.

The court, after careful consideration and for the reasons stated, hereby denies the petition for the return of the property therein described, except the recipe seized and mentioned in the petition, which is hereby ordered to be returned to the defendant, for the reason that the same was not mentioned or described in the search warrant. The motion to quash the search warrant is hereby overruled.