### UNITED STATES v. COSTNER.
### No. 10069.

Circuit Court of Appeals, Sixth Circuit.

Jan. 28, 1946.

James M. Meek, of Knoxville, Tenn. (J. B. Frazier, Jr., U. S. Atty., and James M. Meek, Asst. U. S. Atty., both of Knoxville Tenn., and Clarence W. Bralley, Asst. U. S. Atty., of Johnson City, Tenn., on the brief), for appellant.

Wilbur W. Piper, of Knoxville, Tenn. (Wilbur W. Piper and Hobart F. Atkins, both of Knoxville, Tenn., on the brief), for appellee.

Before HICKS, SIMONS, and MARTIN, Circuit Judges.

HICKS, Circuit Judge.

Appellee was indicted for violations of Sections 2803(a) and 2913 of Title 26 U.S. C.A. Int.Rev.Code. The indictment in three counts charged him, respectively, (1) with transporting; (2) with possessing; and (3) with concealing, distilled spirits, the containers of which did not bear the requisite Internal Revenue stamps. He entered a plea of "not guilty."

Before the hearing appellee filed a motion to suppress the testimony of Smith and Rudd, Inspectors under the Alcohol Tax Unit, Bureau of Internal Revenue, and of Whaley, Sheriff of Sevier County, Tenn., as to all evidence secured by them at the time of his arrest, on the ground that the officers in shooting at appellee's automobile and forcing him to stop on the highway and in forcibly entering and searching the automobile without a search warrant and finding therein un-tax-paid liquor, made an unlawful and unreasonable search and seizure thereof. It was asserted in the motion to suppress that the only evidence to sustain the indictment was obtained by the unlawful search and seizure of the automobile and its contents in violation of appellee's rights under the Fourth Amendment.

The District Court sustained the motion to suppress, hence this appeal.

At the hearing on the motion, appellee testified that on May 7, 1945, while he was driving an automobile on the highway in Sevier County, Tenn., toward Sevierville, he saw a parked car headed away from Sevierville; that one man was standing by the automobile and that he, appellee, turned his car around and went back up the road; that "they took after me and went to shooting" with a shotgun. He testified that he was two or three hundred yards from the parked automobile when he turned around and they opened fire; that he drove about a mile and that four or five shots were fired before his right rear tire was shot down and the car wobbled over the road and he had to halt. He testified that he got out of the car and ran and was shot in the arm by the Sheriff, who was one of the officers in the car that was chasing him; that the officers exhibited no warrant and that while the chase was going on he did not know that they were Federal officers. On cross-examination he admitted that he had 60 gallons of moonshine whiskey in the car.

Smith testified that he had parked his car in front of the Courthouse in Sevierville and had started to the Courthouse when a fellow came down the road in a car and called to him and told him that "Sharkey Costner" (appellee) would be down the road in a short time with a load of moonshine whiskey; that he had heard arrangements made for the delivery of the whiskey and that appellee was going to Knoxville with it. Smith testified that the informant advised him that appellee would be in a 1937 Ford Coupe, Cocke County license number 46-856; that thereupon, he, Smith, got in his car with Rudd, looked for and found the Sheriff, and asked him to go with them and that the three headed up the Jones Cove Road, one of the main roads into Cosby; that they drove about ten miles real fast, stopped and waited and in four or five minutes saw a car approaching from Cosby and that this was about thirty minutes after he had received the

information. Smith further testified that he started his car toward the approaching car, that the latter turned rapidly around but that he, Smith, recognized appellee and the license number of the car.

Smith's account of the chase was that he immediately sounded his siren and that appellee increased speed and headed toward Cosby at a speed of 80 to 83 miles an hour; that he would not stop for the siren and that Rudd seated beside him (Smith), shot the right rear tire of appellee's car with a sawed-off shotgun and that appellee lost control of his car, which went crosswise of the road. Smith testified that appellee and his companion got out of the car when it stopped, and abandoned it; that the agents could see whiskey in the back of the car and found 60 gallons of unstamped moonshine whiskey in half gallon jars. Smith further testified that both men were chased and caught and that appellee was shot in the arm by the Sheriff before he was taken.

Smith further testified that his informant had given him information on prior occasions which had proved reliable; that he imparted the information obtained through the informant to Rudd and the Sheriff. He further testified that the gun used to shoot down the tire was an automatic 12-gauge sawed-off shotgun with a 20½-inch barrel, which carried buckshot, and that the gun belonged to him; that he chased the car for a quarter of a mile before there was any shooting and that he saw the license number long before the tire was shot down.

The Sheriff's testimony was that they had no warrant for the arrest of appellee and no search warrant and that up to the time that they chased the car there was no complaint that appellee had violated the law in his presence.

Rudd confirmed the Sheriff's testimony that they had neither a warrant for appellee nor a search warrant. He further testified they kept the shotgun in the car for purposes of "self-defense or something like that"; that it was carried on a rack below the seat and that he took it off the rack when Costner wouldn't stop for the siren. Rudd was of the opinion that they chased appellee for half a mile and were "most of the time close to him." Rudd testified that when he started shooting he knew who the driver of the car was, though he didn't know to whom it belonged. Asked if there was any necessity for shooting, he replied, "Well, he wouldn't stop and both cars were going at a dangerous rate of speed." Asked why he shot, he answered, "To stop him." He admitted they had no search warrant but that they wanted to stop and search the car.

The evidence does not disclose that the Inspectors made any effort to obtain a search warrant after Inspector Smith had been informed that appellee was transporting untax-paid whiskey, but we may assume that the time available for that purpose was insufficient.

In United States v. Lefkowitz, 285 U.S. 452, 464, 52 S.Ct. 420, 423, 76 L.Ed. 877, 82 A.L.R. 775, the court said:

"The Fourth Amendment forbids every search that is unreasonable and is construed liberally to safeguard the right of privacy. Byars v. United States, 273 U.S. 28, 32, 47 S.Ct. 248, 71 L.Ed. 520. Its protection extends to offenders as well as to the law abiding. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas.1915C, 1177; Agnello v. United States, 269 U.S. 20, 32, 46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409."

Again, in Weeks v. United States, 232 U.S. 383, 391, 34 S.Ct. 341, 344, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas.1915C, 1177, the court said:

"The effect of the 4th Amendment is to put the courts of the United States and Federal officials in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to further secure the people, their persons, houses, papers, and effects, against all unreasonable searches and seizures under the guise of law. *This protection reaches all alike, whether accused of crime or not,* and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws. The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures * * * should find no sanction in the judgments of the courts which are charged at all times with the support of the Constitution, and to which people of all conditions have a right of appeal for the maintenance of such fundamental rights." (Italics ours.)

It is true that in the Weeks case, supra, the court dealt with the seizure of letters and correspondence in a man's home, in his absence and without his authority, or that

of a search warrant, and it is also true that the court in Carroll v. United States, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790, has differentiated the seizure of one's papers and the seizure of stolen goods, or goods forfeitable for a breach of the revenue laws. The court in the Carroll case has also distinguished the necessity of a search warrant for goods subject to forfeiture when concealed in a building and for those concealed in a vehicle where they readily could be put out of reach of a search warrant.

■ Nevertheless, because the protection of the Fourth Amendment reaches those accused of crime, it follows that those suspected of carrying un-tax-paid liquor have certain rights under the Amendment against unreasonable and oppressive acts of over-zealous officers.

■ There is no formula for testing the reasonableness of the conduct of the searching and seizing officers. "Each case is to be decided on its own facts and circumstances." Go-Bart Importing Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374; see also Turner v. Camp, 5 Cir., 123 F.2d 840, 841, 843. In Zimmermann v. Wilson, 3 Cir., 105 F.2d 583, 585, it was said: "The Fourth Amendment protects against unreasonable searches; and 'the search is "unreasonable", only because it is out of proportion to the end sought'." In Re Ginsberg, 2 Cir., 147 F.2d 749, 750, it was said:

"It remains true, however, that each case of this kind is a fact case. The correct decision of each depends not so much upon a higher critical examination of the accumulated decisional gloss as upon a common sense determination of whether, within the meaning of the word the Constitution uses, the particular search and seizure has been 'unreasonable,' that is, whether what was done and found bears a reasonable relation to the authority then possessed and exercised or transcends it to become oppression."

It is beside the point to consider whether the officers had probable cause to search appellee's car without a warrant. It is conceivable that they did. But assuming that they did, our question is, whether the officers under the circumstances of this case, in the excitement incident to the chase, consummated their search and seizure by unreasonable means. We think that they did.

The following quotation from United States v. Kaplan, D.C., 286 F. 963, 974, commends itself to us:

"The enforcement of a law by the impairment of rights may be too costly. The repeal of a wise and good law may be brought about by its harsh and reckless enforcement. Officers, above all others, should observe the law. They should not, as a result of undue enthusiasm or by narrowed vision, wrongfully trespass upon the rights of others. They should not lose a proper sense of relative values of rights and duties. They should not, for instance, jeopardize lives by firing at automobiles in the hope of puncturing tires, when a slight misaim may result in death, even though the automobile might be occupied by a violator of the law. Especially should this be foreborne when inevitably, at times, mistakes will be made, and a car shot at will be occupied by those who are entirely innocent. It must not be forgotten that the innocent may be apprehensive of attack from others than officers of the law, and may * * * conscientiously believe that their only safety is in flight. A fleeing automobile may be defiance of law, but a badly aimed shot may be murder. * * *"

See also United States v. Myers, D.C., 287 F. 260, affirmed in 6 Cir., 4 F.2d 1020.

■ In this case, after locating and giving chase to the suspected car and while they were at no time far behind it, Inspector Rudd fired five shells of buckshot at it from a sawed-off shotgun while it was traveling up to 80 miles an hour on a public highway. It is fortunate that the car was stopped without injury to the occupants. One of them was probably innocent of any wrongdoing, since appellee testified that he had picked up his companion, a boy named Jenkins, who was going to visit his sister near Sevierville, and since the Government dismissed the case as to Jenkins. Further, we think that prudent officers might have reasonably anticipated the presence of innocent travelers on the highway in the line of fire. Further, it may be observed that there was no real necessity for shooting the tires down in an effort to capture the car for there is no evidence that it was about to elude the officers.

As indicated above, our question is primarily one of fact, and we think that there was sufficient evidence to sustain the holding of the District Court.

Affirmed.