## UNITED STATES v. WILLIS.
### Cr. No. 20779.

United States District Court
S. D. California, Central Division.
Sept. 1, 1949.

As Corrected Oct. 4, 1949.

---

James M. Carter, United States Attorney, Herschel E. Champlin, Assistant U. S. Attorney, Robert J. Kelleher, Assistant U. S. Attorney, Los Angeles, Cal., for plaintiff United States of America.

Scott Weller, Los Angeles, Cal., for defendant Andrew Lee Willis.

WEINBERGER, District Judge.

At the conclusion of the trial, the Government counsel moved for dismissal of Count Two of the indictment. This count charged the defendant with having knowingly and unlawfully sold two grains of heroin after its unlawful importation. This motion is granted.

We are now only concerned therefore with Count One, wherein the defendant is charged on June 26, 1949, with knowingly and unlawfully receiving and concealing two grains of heroin after its illegal importation contrary to law.

In this case there seems to be no dispute as to these facts—that one Matthew Beard, an informer, over the phone and personally, arranged with the defendant to purchase from the defendant two capsules or two grains of heroin for the sum of $12.00 and to accomplish this purpose the informant delivered to the defendant currency of the United States consisting of a $10.00 and a $5.00 bill, which were furnished for that purpose by Federal Narcotic

Agent Rual W. Bell. Before the delivery of the money to Beard the serial numbers of the bills were noted on a paper match book cover, the two police officers, Bell and Beard being present at said time.

The money and the match book cover are marked as Government Exhibit No. One for identification.

Following out the plan and arrangement, the money was delivered personally by the informer to the defendant who returned to the informer $3.00 as change. As per arrangement between informant and defendant, the defendant planned to deliver these capsules to the informant within a few moments after the payment of the money as previously outlined.

In carrying out said plan the defendant shortly thereafter was seen driving an auto which reached the curb at or near a street intersection where the informant was waiting for the delivery of the narcotics. from defendant to the informant. As soon as said auto came to a stop the informant stepped off the curb approaching the auto, whereupon one of the police officers and Bell came to the auto, one on each side thereof, and the defendant was then told by them that they were officers and that he was under arrest.

The defendant then suddenly started the car, knocking down one of the officers, who then fired a shot into the left rear tire of the auto, thereby flattening the tire.

The auto then came to a sudden stop. The officers then arrested the defendant and the defendant's clothing was searched by the officers as was also the car which defendant was driving. No narcotics were found. However, one of the officers took the marked bills from him in the search.

During this episode one of the officers testified that he saw the defendant make a brushing motion with his right hand across his face and towards his mouth.

The defendant was taken in an auto by the officers to the Georgia Street Receiving Hospital, where a doctor and nurses who are employed by the Los Angeles Police Department, in the presence of, and at the request of the police officers, and with their assistance, administered to the defendant what is known as a "stomach pump treatment". Bell was also present during this treatment.

In this treatment, defendant was forcibly placed on a table, and his arms and legs were fastened to the table by straps, his jaws were forced open and a cotton pad roll about one-half inch thick was placed in his mouth between his teeth. His nostrils were held by someone so that he was forced to open his mouth, thereby permitting about ten inches of a rubber hose to be inserted down his throat and into the defendant's stomach.

An emetic liquid was poured through the hose into defendant's stomach, thus causing him to vomit and emit a cellophane wrapping containing what remained of two capsules, which were analyzed by a Government chemist as heroin, and which are marked as Government Exhibit Two for identification.

Before this treatment was administered the defendant was told to drink the liquid which was used in the treatment, which he refused to do. He was then also asked to voluntarily submit to this treatment, which he also refused to do.

When the defendant was brought into the hospital one of the officers told the doctor under whose direction the treatment was administered to the defendant that the defendant had swallowed two grains of heroin desired for evidence. The treatment then followed.

It is undisputed that Bell, the Federal Agent, participated in the entire episode and was present and participated in the entire proceedings from the inception of the plan to purchase the narcotics.

It is also undisputed that the officers had no warrant for defendant's arrest, nor any search warrant.

The defendant at no time during all of these proceedings made any admissions as to this offense.

The defendant, at the outset of the trial, moved to suppress the introduction of the evidence relative to the heroin procured from defendant's stomach, and during the trial objected to the introduction of Government Exhibits One and Two and also

moved to strike certain of the evidence as to these exhibits.

Ruling on the motions and objections were reserved by the Court.

■ We hold that there was probable cause for the arrest of the defendant, and that the search which revealed the money and the match folder was reasonable within the meaning of the Fourth Amendment.

The circumstances surrounding the search which disclosed the narcotics are most unusual, and we can find only one instance in the reported cases where evidence procured from the stomach of the defendant was offered in a court of the United States. We can find, in no reported case, nor have we ever heard before, that an officer acting under the authority of the United States government, and sworn to uphold the Constitution, including the Fourth Amendment, has participated in a search such as this.

In the one reported case in the United States courts that of In re Guzzardi, D.C., 84 F.Supp. 294, the court there found that the federal officer had not participated in any manner in the search, but was called in after the evidence had been obtained, and also, that the defendant consented to the search.

In Re Ginsburg, 2 Cir., 147 F.2d 749, 750, it was said:

"It remains true, however, that each case of this kind is a fact case. The correct decision of each depends not so much upon a higher critical examination of the accumulated decisional gloss as upon a common sense determination of whether, within the meaning of the word the Constitution uses, the particular search and seizure has been 'unreasonable,' that is, whether what was done and found bears a reasonable relation to the authority then possessed and exercised or transcends it to become oppression."

In United States v. Costner, 153 F.2d 23, the Circuit Court in its opinion at page 26, observed that it was beside the point to consider whether the officers had probable cause to make the search without a warrant, and stated:

"But assuming that they did, our question is, whether the officers under the circumstances of this case, in the excitement of the chase, consummated their search and seizure by unreasonable means."

■ We should like to quote from the learned Justices of the United States Supreme Court in the case of Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399. The facts in that case concerning the search are not similar to the case at bar, but the opinion of the Court, and the dissenting opinion concurred in by three justices contain language which is appropriate here:

From the opinion of the Court, 331 U.S. on page 150, 67 S.Ct. on page 1101:

"This Court has also pointed out that it is only unreasonable searches and seizures which come within the constitutional interdict. The test of reasonableness cannot be stated in rigid and absolute terms. 'Each case is to be decided on its own facts and circumstances.' * * *

"The Fourth Amendment has never been held to require that every valid search and seizure be effected under the authority of a search warrant. Search and seizure incident to lawful arrest is a practice of ancient origin and has long been an integral part of the law-enforcement procedures of the United States."

From the dissenting opinion, 331 U.S. at page 156, 67 S.Ct. at page 1104, we quote: "If only the fate of the Davises and the Harrises (the defendants) were involved, one might be brutally indifferent to the ways in which they get their deserts. But it is precisely because the appeal to the Fourth Amendment is so often made by dubious characters that its infringements call for alert and strenuous resistance. Freedom of speech, of the press, of religion, easily summon powerful support against encroachment. The prohibition against unreasonable search and seizure is normally invoked by those accused of crime, and criminals have few friends. The implications of such encroachment, however, reach far beyond the thief or the black-marketeer. I cannot give legal sanction to what has been done in this case

748

without accepting the implications of such a decision for the future, implications which portend serious threats against precious aspects of our traditional freedom."

On page 171 of 331 U.S., on page 1111 of 67 S.Ct., the dissenting opinion continues; after a comment upon the importance of maintaining high standards of conduct on the part of the police:

"It may even mean that some offenses may go unwhipped by the law. If so, that is part of the cost for the greater gains of the Fourth Amendment. The whole point about the Fourth Amendment is that 'Its protection extends to offenders as well as to the law abiding,' because of its important bearing in maintaining a free society and avoiding the dangers of a police state."

On page 172 of 331 U.S., on page 1112 of 67 S.Ct., "Stooping to questionable methods neither enhances that respect for law which is the most potent element in law enforcement, nor, in the long run, do such methods promote successful prosecution. In this country police testimony is often rejected by juries precisely because of a widely entertained belief that illegal methods are used to secure testimony. Thus, dubious police methods defeat the very ends of justice by which such methods are justified. * * * by compelling police officers to abstain from improper methods for securing evidence, pressure is exerted upon them to bring the resources of intelligence and imagination into play in the detection and prosecution of crime.

"No doubt the Fourth Amendment limits the freedom of the police in bringing criminals to justice. But to allow them the freedom which the Fourth Amendment was designed to curb was deemed too costly by the Founders. As Mr. Justice Holmes said in the Olmstead case, 'we must consider the two objects of desire both of which we cannot have, and make up our minds which to choose.'"

On page 173 of 331 U.S., on page 1112 of 67 S.Ct., continuing: "It is vital, no doubt, that criminals should be detected, and that all relevant evidence should be secured and used. On the other hand, it cannot be said too often that what is involved far transcends the fate of some sordid offender. Nothing less is involved than that which makes for an atmosphere of freedom as against a feeling of fear and repression for society as a whole."

In Re Guzzardi, the citation of which we have previously mentioned, the District Court judge stated, after quoting the Fourth Amendment as it refers to unreasonable searches and seizures: [84 F. Supp. 295]

"The part of the Amendment quoted above shows the sacredness of the person. The well informed practitioner of the law knows that one's home is one's castle and may not be entered even by the king without the proper legal right to do so, which must be secured from a judicial officer upon direct sworn testimony.

"It is rather difficult to reason one into the conclusion that the sacred person may be so violated, over the protest of that person, as to take from the stomach without consent and without warrant.

"If a stomach pump may be used, then the surgeon's knife may be used. If the stomach pump can be justified, then the opening of one's person by the surgeon's knife can be justified. We would then have returned to trial by ordeal which has long since been abolished by right-thinking, liberty-loving people."

We may venture a little further into the realm of conjecture than did the judge in the case just read from to consider whether, if a search such as was made in the instant case may be approved, would it not likewise follow that if the narcotics after being swallowed had passed from the stomach to the blood stream, some officers might feel it incumbent upon them to drain the defendant of part of his life-blood in an effort to discover the hidden evidence?

■ We are not here required to determine whether a warrant should issue, in any case, for a search such as was made here; nor are we called upon to decide whether the evidence would be acceptable had officer Bell known nothing

of the matter until after the narcotics were found; we feel that a decision as to the admissibility of the narcotics rests, not upon the question "was the evidence obtained without a search warrant" nor, "was the evidence obtained by a search incident to a lawful arrest", but upon the question:

"Was the search an unreasonable one within the meaning of the Fourth Amendment to the Constitution?"

We must answer that question with a holding that the search which led to the discovery of the narcotics was an unreasonable one within the meaning of the Fourth Amendment.

In so holding, we need not enlarge upon the language of the Supreme Court Justices which we have quoted concerning the necessity of observing the constitutional safeguards, in fact, we cannot enlarge upon the all-inclusive words of these learned men. We do feel constrained to add, however, that were it not for the Fourth Amendment, and the historical abuses which led to its passage, one might be inclined to sanction almost any treatment which might be given to a dealer in narcotics in order to apprehend those engaged in such horrible traffic; that we are obliged to strike the evidence concerning the narcotics represents no victory for this defendant; and that we are obliged to find him not guilty represents no triumph of innocence; rather, it represents an adherence to the principles of freedom secured by our Constitution, the provisions of which protect the innocent, and, in cases such as this, those who are not deserving of its protection.

The decision of the Court on the motions regarding the evidence is:

The money and the match cover will be admitted as Exhibit No. 1.

The heroin, exhibit No. 2, will not be admitted in evidence. No testimony concerning the possession by the defendant of such narcotics will be admitted, nor will any evidence concerning the exhibit itself be considered.

Without this evidence thus held inadmissible, there is not sufficient in the record to show the guilt of the defendant beyond the reasonable doubt required by law.

The judgment of the Court, is, therefore, that the defendant is not guilty as to the remaining count of the indictment.

Bond is exonerated.