Charles E. **BLACKFORD**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 15427.

United States Court of Appeals
Ninth Circuit.

July 10, 1957.

Rehearing Denied Sept. 30, 1957.

William F. Gavin, San Diego, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Los Angeles, Cal., Howard R. Harris, Harry D. Steward, San Diego, Cal., Louis Lee Abbott, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before STEPHENS, CHAMBERS and BARNES, Circuit Judges.

BARNES, Circuit Judge.

Appellant was indicted on charges of illegally importing (Count I) and concealing (Count II) narcotics.[1] He waived jury trial and was found guilty by the District Court. The narcotics consisted of one ounce three hundred and thirty-three grams of heroin, which was introduced in evidence. The heroin was carried over the Mexican border cached in appellant's rectum. It was the prime evidence used to convict him. Appellant made a timely motion to suppress this evidence based on alleged deprivation of his constitutional rights under the Fourth and Fifth Amendments. The motion was denied. The only question before us is whether appellant's consti-

---

I. 21 U.S.C.A. § 174.

tutional rights were transgressed by the participation of federal law enforcement officers in two separate attempts to effect the removal of the narcotics. The facts upon which appellant's claim is grounded are as follows.

On the night of July 31, 1956, appellant Charles Blackford, an American citizen, walked across the International Boundary Line at the San Ysidro, California, port of entry. He was stopped by the customs officer on duty inspecting pedestrian traffic, asked if he had acquired any article in Mexico, and upon replying in the negative, was requested to, and did accompany the officer into the customs building for a personal examination. He was requested to, and did, remove his coat. He thereby revealed numerous puncture marks in the veins of his arms. Inquiry elicited the admission that Blackford was "chippying" (i. e., using narcotics occasionally), and that he was then on parole from a California state conviction for possession of marijuana. He was then directed to disrobe entirely. This he willingly did. No contraband was discovered in his clothing or on his person at that time. However, the customs officer, joined by an associate, noticed a substantial quantity of foreign substance of a greasy nature outside appellant's rectum. Blackford, in answer to questioning, denied that he was carrying narcotics. Interrogation was continued.

According to the officers, Blackford then admitted that he had about a "spoon" (meaning a tablespoon) of heroin encased in a rubber condom in his rectum. Pursuant to the officer's suggestion, appellant sought to remove it himself by forcing a bowel movement, but was unsuccessful. Appellant was then placed under arrest and handcuffed. According to Blackford, he never admitted at the border he was carrying narcotics, and he denied that he had endeavored to remove same. The trier of fact accepted the officers' version of the conversations and events that allegedly took place.

To return to the narrative, Customs Agent Polite, following Blackford's un-

successful attempts at self-help, took him to the San Diego County Jail. There they awaited the arrival of Dr. Harry Depew, a qualified physician and surgeon, licensed to practice medicine by and in the State of California. Depew informed appellant that he planned to make a rectal examination. Appellant denied that he had secreted any narcotics and then he asked if he could object to the examination. He was apprised that he could protest but that the examination was going to be made anyway. Blackford undressed without assistance. Dr. Depew attempted manual removal of the object. Appellant refused to cooperate, largely by refusing to bend over, and tried by various movements to impede the examination. Dr. Depew was able to determine the presence of some foreign object in the anal cavity but was unable to effect its removal.

Agent Polite then took Blackford to the United States Naval Hospital at San Diego, California. Here appellant's resistance sharpened. Two hospital corpsmen were required to exert force to undress him and to hold his arms and to force him to bend his body to permit Agent Polite to remove his trousers and shorts, and Dr. Eugene B. Gregory, also a qualified physician, to make a manual examination. When unable to reach the cache manually, Dr. Gregory undertook to remove the object with the aid of an anoscope and forceps. A portion of an outer condom surrounding the narcotics tore during this attempt. This gravely alarmed appellant and he thenceforth cooperated fully. After a number of enemas were administered to appellant under Dr. Gregory's direction and supervision, in which proceedings appellant cooperated willingly, the object, namely, the heroin, within an inner and outer rubber sheath, was finally recovered.

The District Court found that appellant had consented to the preliminary examination at the customs building but not to the examinations by Doctors Depew and Gregory until appellant learned that the condom had broken, at which time he "consented." The District

Court concluded that none of appellant's constitutional rights had been violated.

■ The Fourth and Fifth Amendments are companion pillars in the Bill of Rights structure which protects the individual against arbitrary government invasion of personal freedom and liberty. Though their ultimate goal be the same, the Amendments are the product of varied historical experience and they combat different evils.[2] The Fourth Amendment safeguards the right to be free from unreasonable searches and seizures; the Fifth Amendment guarantees the individual against being compelled to give evidence against himself and also assures to him, under the Due Process proviso, fair and humane treatment by federal law enforcement officers. We deal first with the Fourth Amendment.

The Fourth Amendment protects against invasion of the right of privacy. To effectuate its basic purpose and policy, the prohibitory language has been implemented by the Federal exclusionary rule. Evidence illegally obtained in contravention of the Fourth Amendment is inadmissible in a federal prosecution.[3] This is not a constitutional mandate, but a rule of evidence, and hence has no application to state prosecutions.[4] Thus, if Blackford's rights were infringed under this Amendment, the narcotics were inadmissible, and the judgment of conviction must be reversed. This is also true if his Fifth Amendment rights were violated.[5]

Does this search and seizure transcend the bounds of the Fourth Amendment?

The Fourth Amendment has a rich heritage. Its genesis lies in the fervent discontent aroused in the American colonies in the period antedating the Revolution, by the flagrant abuse of "writs of asistance." It was the pernicious use of these writs which led James Otis, Attorney General of the Massachusetts Bay Colony, to resign in protest and utter an historic speech of which John Adams later wrote, "American independence was then and there born."[6] Resentment against the general search warrant ran high. Intense and widespread sentiment demanded relief from the ransacking of private dwellings. And so the Fourth Amendment was born. It represents recognition and embodiment in our fundamental framework of government of the precept that a man's property and person are inviolable to search except upon due cause.[7]

■ An ancient exception to the search and seizure prohibition is the right to search the person of an individual incident to a lawful arrest.

"* * * no one questions the right, without a search warrant, to search the person after a valid arrest. The right to search the person incident to arrest always has been recognized in this country and in England. Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652. Where one had been placed in the custody of the law by valid action of officers, it was not

2. Price v. Johnson, 9 Cir., 125 F.2d 806, 808. Wigmore on Evidence, 3rd Ed., Vol. VIII, § 2264. But see Davis v. United States, 328 U.S. 582, 587, 66 S.Ct. 1256, 90 L.Ed. 1453; Bram v. United States, 168 U.S. 532, 543, 18 S.Ct. 183, 42 L.Ed. 568; Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746.

3. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652.

4. Irvine v. People of State of California, 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561; Wolf v. People of State of Colorado, 338 U.S. 25, 39–40, 69 S.Ct. 1359, 93 L.Ed. 1782 (concurring opinion).

5. Rochin v. People of State of California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183; Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829.

6. 10 Adams, Works, 247.

7. For a more complete discussion of the historical background of the Fourth Amendment, see the dissenting opinions in Davis v. United States, 328 U.S. 582, 603–605, 66 S.Ct. 1256, 90 L.Ed. 1453, and Harris v. United States, 331 U.S. 145, 157–162, 67 S.Ct. 1098, 91 L.Ed. 1399.

unreasonable to search him." United States v. Rabinowitz, 339 U.S. 56, 60, 70 S.Ct. 430, 432, 94 L.Ed. 653. and,

> " * * * whatever is found upon his person or in his control which it is unlawful for him to have and which may be used to prove the offense may be seized and held as evidence in the prosecution." Carroll v. United States, 267 U.S. 132, 158, 45 S.Ct. 280, 287, 69 L.Ed. 543.

E. g., Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145; United States v. Heitner, 2 Cir., 149 F.2d 105. The underlying rationale for the exception is that if the culprit, in the vernacular, "be caught with the goods," the officers should have the right to dispossess him of the instrumentalities or fruits of the criminal activity. See People v. Chiagles, 237 N.Y. 193, 196, 142 N.E. 583, 584, 32 A.L.R. 676. Another reason is, of course, to disarm the suspect.[8]

■■■ That doctrine is applicable to the instant facts. The arrest was lawful. An arrest without warrant is valid if the officer has probable cause for believing that the suspect has or is committing a felony. United States v. Rabinowitz, supra; Carroll v. United States, supra; Cavness v. United States, 9 Cir., 187 F. 2d 719. Probable cause exists where

> " * * * 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonable trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, quoting Carroll v. United States, supra, 267 U.S. at page 162, 45 S.Ct. at page 288.

The customs officer did not exceed his authority in detaining appellant nor by asking him to remove his coat.

> "Travellers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may lawfully be brought in." Carroll v. United States, supra, 267 U.S. at page 154, 45 S.Ct. at page 285.

The tell-tale needle marks and appellant's admission that he had been convicted of using narcotics furnished sufficient cause for requiring a further and more complete physical examination. That more detailed examination, revealing the greasy and alien substance around the rectal opening, and appellant's admission that he was carrying narcotics, leave no doubt as to the legality of the ensuing arrest. The customs officer would have been derelict in his duty had he not done as he did. Indeed, appellant does not question the validity of the arrest.

■■ Having arrested Blackford, the officers were entitled to search his person and to retain incriminating evidence uncovered by the search.

We then come to the significant and novel question here presented. Is there any Fourth Amendment restraint on the nature and extent of the search of a person made incident to a lawful arrest? More specifically, must there not only be sufficient justification for the search of the person, but, in addition, must the search and seizure itself accord with a standard of reasonableness more stringent than the Due Process limitations delineated in Rochin v. People of State of California, supra, and Breithaupt v. Abram, 352 U.S. 432, 77 S.Ct. 408, 1 L. Ed.2d 448?[9]

8. See, e. g., United States v. Rabinowitz, supra, dissenting opinion, 339 U.S. at page 72, 70 S.Ct. at page 437.

9. Both of these cases involved state proceedings as to which the Fourth Amendment would not apply to bar the admission of the evidence claimed to have been illegally obtained. Wolf v. People of State of Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782.

We find no Supreme Court or Court of Appeals decision which has decided this issue.[10] Two District Court cases, relying principally on the literal language of the Amendment, have answered the above questions in the affirmative. United States v. Willis, D.C., 85 F.Supp. 745; In re Guzzardi, D.C., 84 F.Supp. 294.[11] Where the issue involved the premises and possessions of the person arrested as distinguished from his person, it has been held that the search and seizure, though incident to an arrest must not go beyond what is reasonable under the circumstances.[12] Can it possibly be said that it is the command of the Fourth Amendment that officers act reasonably in searching property, but not so in searching a fellow human being? We think not.

■■ The Fourth Amendment provides that, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *." It makes no differentiation between persons and property. It does not value property over human anatomy, nor differentiate between them. The prohibition is broad and unqualified. All unreasonable searches and seizures are forbidden. United States v. Rabinowitz, supra; United States v. Carroll, supra. It is true, as heretofore noted, that historically the Fourth Amendment was designed to curb the nefarious practice of arbitrary government invasion of private homes. But the Framers of our Constitution in their infinite wisdom, did not produce so narrow a safeguard. The Amendment they enacted did more than simply provide protection against the immediate threat. It provided a bulwark against unreasonable governmental searches and seizures conducted on persons as well as places. It should be construed "liberally to safeguard the right of privacy." United States v. Lefkowitz, 285 U.S. 452, 464, 52 S.Ct. 420, 423, 76 L.Ed. 877. We believe that it comports with the spirit as well as the letter of the Constitution to read the Fourth Amendment as imposing a restriction on the nature and extent of searches and seizures made incident to a lawful arrest. To do otherwise would be to ignore the plain words of the Amendment and restrict the broad intent inherent in the principle enunciated.

Thus, we must apply the test of reasonableness to the conduct of the officers in the case at bar. This is a stricter test than that applied to state proceedings under the Due Process Clause of the Fourteenth Amendment in Rochin and Breithaupt.[13] The test there is whether the alleged activity of law enforcement officers in obtaining the questioned evidence fell short of civilized standards of decency and fair play. There may be, we conceive, conduct which, while unreasonable, is not so unconscionable that it "shocks the conscience" or "offend[s] a sense of justice." Rochin, 342 U.S. at page 172, 72 S.Ct. at page 208. On the other hand, if conduct is reasonable, it must perforce satisfy Due Process requirements.[14] Ac-

---

10. The most penetrating expositions of the search-incident-to-arrest doctrine appear in the dissenting opinion in United States v. Rabinowitz, supra, 339 U.S. at pages 71–72, 75–81, 70 S.Ct. at pages 437–438, 439–442, which deals with a search of the premises as distinguished from a search of the person arrested, and United States v. Kirschenblatt, 2 Cir., 16 F.2d 202, 51 A.L.R. 416.

11. For an analysis of the cited cases: See Comment, 66 Harvard Law Review 122 (1952), and Bachelder, Use of Stomach Pump As Unreasonable Search and Seizure, 41 Jour.Crim.L. & Criminology 189 (1950). Cf. United States v. Kraus,

D.C., 270 F. 578, 582; Garske v. United States, 8 Cir., 1 F.2d 620, 622.

12. United States v. Rabinowitz, supra, and cases cited therein.

13. It cannot be doubted that the Due Process Clause of the Fifth Amendment makes the Rochin case applicable to federal criminal proceedings.

14. It is not a novel proposition that federal courts have more control over federal criminal proceedings than they do over criminal trials in the state courts. See McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819.

cordingly, if the actions here questioned were reasonable, they did not constitute a violation of either the Fourth or Fifth Amendments.

 There is no slide-rule formula yet devised for ascertaining whether specific conduct is or is not reasonable. Each case must turn on its own relevant facts and circumstances. United States v. Rabinowitz, supra; Harris v. United States, 331 U.S. 145, 150, 67 S.Ct. 1098, 91 L.Ed. 1399; Go-Bart Importing Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374. "Reasonableness is in the first instance for the District Court to determine." United States v. Rabinowitz, 339 U.S. at page 63, 70 S.Ct. at page 434. The determination by that court of a constitutional question is not binding upon us, but is entitled to weight. The Court below determined that the officers here acted reasonably. We agree.

The Supreme Court decisions in Rochin and Breithaupt, though involving a different standard, nonetheless furnish the most helpful judicial guide to a resolution of this question. In Rochin, the defendant's residence was illegally entered by police officers who had some information that Rochin, a known narcotics addict, was selling narcotics. Observing the suspect putting two capsules in his mouth, the officers violently tried to prevent him from swallowing them by making him gag. Failing in this, they took the defendant to a physician who pumped defendant's stomach against his will and forcible resistance. The capsules were recovered and proved to contain morphine. This evidence was used to convict him. The Supreme Court reversed the judgment of conviction. It is difficult to ascertain whether the Supreme Court was condemning the entire course of illegal conduct.

"Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation." 342 U.S. at page 172, 72 S.Ct. at page 209.

or whether it was critically appalled by the stomach pumping alone.

"It would be a stultification of the responsibility which the course of constitutional history has cast upon this Court to hold that in order to convict a man the police cannot extract by force what is in his mind but can extract what is in his stomach." 342 U.S. at page 173, 72 S. Ct. at page 210.

Later expressions have not afforded a definitive answer to this question. In its latest pronouncement on the subject, the Supreme Court indicates that Rochin was decided on the basis that the whole chain of events was shocking and brutal. Breithaupt v. Abram, supra, 352 U.S. at page 435, 77 S.Ct. at page 412.

In the Breithaupt case itself, the Court upheld as non-violative of the guarantees of Due Process an involuntary blood test for intoxication. There the petitioner was unconscious when the blood was extracted. He neither affirmatively consented or protested. The Court was careful to stress the fact that the sampling was taken by a qualified physician under medically approved conditions. In analyzing the constitutional issue, the Court said:

"As against the right of an individual that his person be held inviolable, even against so slight an intrusion as is involved in applying a blood test of the kind to which millions of Americans submit as a matter of course nearly every day, must be set the interests of society in the scientific determination of intoxication, one of the great causes of the mortal hazards of the road. * * * Furthermore, since our criminal law is to no small extent justified by the assumption of deterrence, the individual's right to immunity from such invasion of the

body as is involved in a properly safeguarded blood test is far outweighed by the value of its deterrent effect due to public realization that the issue of driving while under the influence of alcohol can often by this method be taken out of the confusion of conflicting contentions."

The Court held that the blood tests were neither shocking nor brutal.

Of course, we are not faced with a choice between Breithaupt and Rochin. To each of those cases was applied a more liberal test than that allowed by the Fourth Amendment. We think, however, that Breithaupt, the most recent Supreme Court decision in this area, is indicative of the true state of the law. There, as here, there was no actual consent to the invasion of the defendant's body. There, as here, the examination and extraction was performed by a physician. And there, as here, there were no aggravating circumstances such as existed in Rochin. On the other hand, there are several significant factual differences that lead us to conclude that Rochin is not dispositive of the instant case. First, as stated above, Rochin was subjected to a whole series of abuses and violations of his rights commencing with the unlawful entry into his dwelling, continuing with the forcible attempt by the officers to prevent him from swallowing the capsules, and culminating with the forcible stomach pumping. In contrast, Blackford was treated civilly throughout and was subjected to physical pressure only when the examinations were to be performed. The officers made no attempt themselves to force the evacuation of tne object. Second, and also very important, the officers in Rochin had only a suspicion that the defendant had swallowed narcotic pills. Here the officers had almost incontrovertible proof that Blackford had secreted narcotics. They knew specifically what Blackford had concealed, where it was, and how much was there. They knew because Blackford told them. His admission was

corroborated by the presence of the greasy type substance around the rectum.

As to the actual physical examinations, they were conducted by qualified physicians, under sanitary conditions, with the use of medically approved procedures. This kind of examination is a routine one which countless persons have undergone. It is an uncomplicated and non-hazardous procedure. It normally is not painful to a healthy person. Pain results only when the patient refuses to cooperate fully, as Blackford did here. Consequently, whatever pain Blackford endured was due to his actions in attempting to impede the examination. It was self-inflicted. The officers did not exert more than the least amount of force necessary to enable the doctors to examine appellant. There is not the slightest suggestion in the evidence of threats or attempts to beat or strike him.

In judging the reasonableness of conduct, it is important to determine the necessity for the action and what, if any, alternatives were presented.

 The Court will take judicial notice of the fact that the Mexico-California border is one of the major centers for the importation of narcotic drugs into the United States.[15] Moreover, we are told in the record that between 18 and 20% of the international traffic in narcotics in this area is conducted by smuggling the drugs in various body cavities. One need only read the daily newspaper to recount the horror, harm and hardship that these drugs produce. The problem of detecting and putting to an end this source of supply, and of doing it effectively, is one of great magnitude and importance to the American people. It is a task which daily confronts law enforcement officers along the border.

With this general background in mind, we turn to the specifics. A man walks across the border carrying in the interior of his body a commercial quantity of heroin. He is properly accosted and admits concealment of the heroin. The

15. Cf. United States v. Carroll, supra, 267 U.S. at page 160, 45 S.Ct. at page 287.

question then is what should be done? If he consents to its removal, there is no problem. But if he does not, what then? If the officers simply jailed Blackford, his attorney would have sought his release by way of a writ of habeas corpus. If the writ be granted, Blackford would walk out with the heroin. If no writ were sought, or if one be denied, it would be necessary for the jailers to watch Blackford day and night in order to prevent the evidence from being expelled and destroyed or consumed. The officers would risk and aid what is daily sought to be avoided, the taking of narcotics inside jails and institutions. What an intolerable burden that would cast upon peace officers and jail administrators. Does the Constitution compel this result? Are the hands of law enforcement officers so tightly bound that they must institute a system wholly impracticable and unworkable or else permit the culprit to escape? Is it constitutionally necessary to sacrifice the abiding interest of all citizens of the United States to be free and safe from these insidious drugs to avoid offending the sensibilities of admitted narcotics importers?

We cannot so read the Constitution. There is nothing in the Bill of Rights which makes body cavities a legally protected sanctuary for carrying narcotics. It is not per se violative of the Constitution to remove foreign matter from body cavities, (Breithaupt v. Abram, supra) any more than it is to force a person with narcotics in a clenched fist to open his hand. It is necessary to inquire into the particular circumstances to determine whether in the precise case before the court, the search and subsequent seizure are unlawful. Here the facts not only do not require us to reverse the judgment of the District Court, but encourage us to affirm it. The precise knowledge of what and how much was where, the use of only slight force, the handling of the examinations by qualified doctors, with the use of scientific procedures, and under sanitary conditions, all militate against finding this search and seizure to be unreasonable. The search and seizure not being unreasonable, it follows that there was no violation of the prohibitions of the Due Process Clause of the Fifth Amendment.[16]

We, as any court, can and do decide only the case before us and no other. By our decision on the facts at bar, we are not to be understood as granting carte blanche authority to subject any human being to any type of physical examination. Where the facts reveal conditions different from those here present, this Court will act to defend and protect the civil liberties and rights of wronged individuals, just as, we are certain, will the trial courts.

There remains to be considered yet another part of the Fifth Amendment. The pertinent proviso states that "No person * * * shall be compelled in any criminal case to be a witness against himself." This is the privilege against self-incrimination. It was not applicable to the Rochin and Breithaupt cases for both those cases concerned state prosecutions as to which the privilege does not apply. Twining v. State of New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97; Palko v. State of Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288; Adamson v. People of State of California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903.[17]

16. Two state court cases upholding convictions based on evidence obtained by methods and under circumstances similar to those at bar are Ash v. State, 139 Tex.Cr.R. 420, 141 S.W.2d 341, and People v. Woods, 139 Cal.App.2d 515, 293 P.2d 901.

17. The Supreme Court has never accepted the dual contentions of Justice Douglas and Justice Black that the Fourteenth Amendment incorporates the Bill of Rights, hence making the privilege against self-incrimination apply to state court proceedings and also that the privilege itself is not limited to testimonial compulsion. Adamson v. People of State of California, 332 U.S. 46, 68–123, 67 S.Ct. 1672, 91 L.Ed. 1903 (dissenting opinion); Rochin v. People of State of California, 342 U.S. 165, 175, 179, 72 S.Ct. 205, 96 L.Ed. 183 (dissenting opinion).

Historically and analytically the privilege is confined in scope to testimonial compulsion.

" * * * the prohibition of compelling a man in a criminal court to be a witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may .be material." Holt v. United States, 218 U.S. 245, 252–253, 31 S. Ct. 26, 54 L.Ed. 1021.

The privilege protects one only against extracting from the person's own lips an admission or confession of guilt. The distinction between testimonial compulsion and real evidence taken from the person of the accused is one drawn by both the courts [18] and the writers.[19] The privilege has never had nor was it intended to have application to the removal of real evidence from the person of the accused. Therefore, the taking of evidence forcibly from appellant's body does not come within the purview of testimonial compulsion. Accordingly, we hold that there has been no infringement of appellant's privilege against self-incrimination.

Judgment affirmed.

CHAMBERS, Circuit Judge (concurring).

I concur in the opinion of Judge BARNES. If the only difference between Rochin's case and this one is that Rochin was at one end of the alimentary canal and Blackford was at the other, then Judge BARNES is wrong. While Rochin was a 14th Amendment case, I am satisfied, whether a case is on the federal or state side, the Supreme Court, relying on one amendment to the Constitution or another, is not going to tolerate convictions based upon evidence

obtained by abusive, "high handed" methods. When Rochin was announced I was enthusiastic about it. I still am.

But as I see it, the Supreme Court's policy is to uphold human dignity. I cannot say that a man is devoid of dignity who, in the presence of officers about to arrest him, quickly swallows the contraband, as Rochin did.

But here it was Blackford who created, who first takes us into this disgusting sequence. He made the deposit in his body through the anal opening. The officers found incriminating real evidence on the exterior of Blackford's body. He admitted that he had narcotics and where he had them. What the officers did was not torture or abuse. I do not say that the depraved have no rights. But I do say that to my sensibilities all of the shockingness was Blackford's.

Also, I am impressed with the doctor's testimony that proper concern for the prisoner's own health required prompt removal of this foreign body.

Judge STEPHENS suggests that nature might have taken care of this problem. Should the officers have left Blackford alone, there to destroy the evidence, or should they have left him with guards? And, with what kind of plumbing? Furthermore, I do not know whether nature would have evacuated within a reasonable time what Blackford had secreted.

STEPHENS, Circuit Judge (dissenting).

I am unable to go along with my associates. I agree that the narcotic problem is very serious and, of course, no sympathy can rightly be extended to the peddler or to the low creature who sneaks a narcotic across our borders.

But to authorize the ex parte star chamber invasion of body privacy by in-

---

18. Haywood v. United States, 7 Cir., 268 F. 795, 802; McFarland v. United States, 80 U.S.App.D.C. 196, 150 F.2d 593; Nueslein v. District of Columbia, 73 App. D.C. 85, 115 F.2d 690. See also, Adamson v. People of State of California,

332 U.S. 46, 52, 67 S.Ct. 1672, 91 L. Ed. 1903.
19. Wigmore on Evidence, 3rd Ed., Vol. VIII, § 2263; McCormick on Evidence, Chap. 13, § 126, pp. 263–264.

spectors at our ports is shocking and abhorrent and is fraught with almost certain abuse. I fully appreciate the high character of most of the inspectors and the very difficult duty which is theirs, but the power to subject one entering this country through its ports to the possibility of such an inquisition and man-handling seems on its face to come within the interdiction of the Fourth Amendment. I think the illustration set out in the opinion of the enforced opening of a closed hand, whatever may be right or wrong about it, is unfortunate and not apposite. And I do not see the Federal Courts dismissing an accused from custody by *habeas corpus* where the circumstances would reasonably point to the belief that the accused is concealing narcotics within his body and that nature would answer the question one way or another in a short period of time.