**UNITED STATES of America, Plaintiff,**

**v.**

**Michael Curtis MILLER, Defendant.**

**Cr. A. No. 1788.**

United States District Court
D. Delaware.
Dec. 15, 1966.

Alexander Greenfeld, U. S. Atty., and L. Vincent Ramunno, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

N. Maxson Terry, Jr., of Terry & Terry, Dover, Del., for defendant.

## OPINION

CALEB M. WRIGHT, Chief Judge.

This is a criminal prosecution for violation of the Dyer Act, 18 U.S.C. § 2312 (1948). The defendant moves to suppress certain evidence he alleges was procured in violation of his constitutional rights. The defendant further moves to dismiss the information on the ground that it is based on evidence obtained in violation of his constitutional rights.

At 11:45 a. m. on June 14, 1966 the defendant, Airman Third Class Michael Curtis Miller, was apprehended in possession of a stolen 1966 Ford Mustang automobile.[1] The arrest was made by an Air Policeman on the Dover Air Force Base.

After a cursory search at the scene of the arrest, the defendant was taken to the Base Air Police headquarters for "administrative processing." Shortly thereafter, the Air Police took him to the Office of Special Investigations (OSI) for questioning. Upon his arrival at OSI headquarters the defendant was "strip searched." That is to say: his clothes were removed; their contents were confiscated; and the defendant's body was examined for weapons. Fol-

---

1. This prosecution does not relate to the stolen Mustang in which the defendant was apprehended. It relates to another theft—that of a 1965 Mercury belonging to a Major Fender.

lowing the search the defendant was permitted to reclothe himself in his own attire, but certain of his possessions were not returned to him. The strip search was pursuant to the directives of the OSI manual, "Investigative Responsibility, Techniques and Procedures" (hereinafter OSI Manual). It was standard procedure in cases of this nature.

> "Prior to interrogating a subject or suspect who has been taken into custody by police authority in connection with a crime of a serious nature, particularly one involving personal violence, the agent will first conduct a thorough and careful search of the person and confiscate any weapons he might possess. Such a search will be conducted even though the subject or suspect might previously have been searched for weapons by the Air Police." ¶ 2–1–24.

Among the items not returned to the defendant were a set of car keys. These keys are one of the items whose suppression is sought.

Close questioning of the defendant about the theft of the Mustang disclosed significant similarities between that theft and the unexplained disappearance in February, 1966 of a vehicle belonging to a Major Fender.[2] The similar pattern of the two thefts, when coupled with the defendant's unexplained possession of the set of car keys uncovered in the strip search, aroused the suspicions of the OSI investigator. He began to focus his questions on the theft of the Fender vehicle. The interrogation culminated in the preparation and signing of a statement inculpating the defendant in the theft of the Fender vehicle. At no time during the interrogation was the defendant notified of his right to have court-appointed counsel present during the interrogation or his right to remain silent.[3]

The statement to the OSI investigator was signed shortly after 5:00 p. m., and the defendant was then examined by Special Agent Pearthree of the Federal Bureau of Investigation. Agent Pearthree notified the defendant of his right to have counsel present, and of his right to remain silent. However, Agent Pearthree did not advise the defendant that counsel would be provided for him should he so elect, and that such counsel's presence at the interrogation could be demanded as of right. At the conclusion of the interview with Agent Pearthree the defendant signed a second inculpatory statement.

On June 15th, the day following his arrest, the defendant was taken before a United States Commissioner. When told that, being unable to afford counsel, he had the right to have counsel provided for him, the defendant immediately requested the assistance of such counsel. Prosecution by indictment was waived and the defendant was arraigned on July 19th for the interstate transportation of the stolen Fender vehicle.

Defendant now petitions this court for the suppression of certain evidence. Specifically, he contends that the two statements which were taken from him are inadmissible since his interrogators neglected to inform him of his right to have court-appointed counsel present during the interrogations. Defendant further seeks the suppression of the car keys, contending that they were seized in violation of his rights under the Fourth Amendment. Defendant's motion is made under Rule 41(e), Federal Rules of Criminal Procedure. Finally, the defendant seeks the dismissal of the information lodged against him on the

2. Both vehicles had been stolen twice. In the case of Major Fender's automobile, the first time it was stolen the Major had left the keys in it. However, the second time it was stolen the theft was accomplished with the aid of either a skeleton or duplicate key. The same facts surrounded the first and second disappearances of the Mustang. To the trained OSI investigator these similarities demanded an investigation of the possibility of the defendant's participation in the unsolved thefts of the Fender vehicle.

3. See the discussion of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), at note 6, infra.

grounds that it rests upon evidence seized in violation of the Fourth and Fifth Amendments.

At the outset it must be observed that it is doubtful whether the Fourth and Fifth Amendments confer upon military personnel a protective cordon of the same dimensions as that conferred upon ordinary citizens.[4] This is an unsettled area of constitutional law, but the cases unanimously support the proposition that military personnel lose some of their rights upon joining or being inducted, into the Armed Forces. Certainly there is no right to trial by jury, indictment by grand jury, and other traditional accoutrements of the common law criminal process. Apparently, the double jeopardy provisions of the Fifth Amendment are not applicable to military sentencing.[5]

> "Military law, like state law, is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment. This Court has played no role in its development; we have exercised no supervisory power over the courts which enforce it; the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment. The Framers expressly entrusted that task to Congress." Burns v. Wilson, 346 U.S. 137 at 140, 73 S.Ct. 1045, 1047, 97 L.Ed. 1508 (1953).

Yet, even in those cases containing expressions of deference to the paramount necessity in the Armed Forces for discipline, there are expressions born of a distrust of military justice. Shortly after the above passage Chief Justice Vinson tempered his earlier remarks:

> "The military courts, like the state courts, have the same responsibilities as do the federal courts to protect a person from a violation of his constitutional rights." 346 U.S. at 142, 73 S.Ct. 1045, 1048.

The doctrine which exalts military efficiency above individual liberty is rooted in cases considering habeas corpus petitions which seek the petitioner's release from confinement imposed by courts martial. The present case presents a distinguishable factual situation. Here the person whose rights were allegedly invaded is a military man. The conduct complained of is that of military authorities and an FBI agent summoned by the military. But, here the military authorities have chosen to invoke the criminal jurisdiction of the civilian courts to sanction the defendant's misconduct. This case is altogether different from

---

4. See Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). Mr. Justice Black observed:

    "As yet it has not been clearly settled to what extent the Bill of Rights and other protective parts of the Constitution apply to military trials." 354 U.S. at 37, 77 S.Ct. at 1241.

    See also Ex parte Benton, 63 F.Supp. 808 (N.D.Cal.1945), where the Court noted that,

    " * * * the constitutional guarantees of the 5th and 6th amendments relating to criminal prosecutions may not be invoked in 'cases arising in the land or naval forces' of the United States." 63 F.Supp. at 810.

    Further see United States ex rel. Toth v. Quarles, 350 U.S. 11, 15, 76 S.Ct. 1, 100 L.Ed. 8 (1955), where the Supreme Court noted that the federal courts provided more constitutional safeguards than the military tribunals:

    "[A]ny expansion of court-martial jurisdiction like that in the 1950 Act necessarily encroaches on the jurisdiction of federal courts set up under Article III of the Constitution where persons on trial are surrounded with more constitutional safeguards than in military tribunals." Note, 70 Harv.L. Rev. 1043 (1957).

5. Swaim v. United States, 165 U.S. 553, 17 S.Ct. 448, 41 L.Ed. 823 (1897), where the court permitted the President to twice remit a case to a court martial urging an increased sentence. If the double jeopardy provisions of the Fifth Amendment had applied, such conduct would have been unconstitutional. See the opinion of Mr. Justice Black for the majority in Reid v. Covert, 354 U.S. 37–38, n. 68, 77 S.Ct. 1241 (1957).

those in which military courts are meting out military justice to military personnel.

American criminal jurisprudence loathes summary proceedings. Recent cases bear witness to a trend which enshrines the constitutional rights of each individual. Traditionally, military justice has been tolerated because of the acknowledged deleterious effect which civilian interposition would have upon the efficient operation of the military. However, the tolerance accorded military justice is meager. Individual rights are zealously guarded against any expansion of military authority, or any attempted extension of military justice's summary procedures. Ex parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866); Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).

The argument that the Fourth and Fifth Amendments have no application to the search of Miller's person and his interrogation where the criminal jurisdiction of the federal courts is being invoked against military personnel must be rejected. It represents an attempt to extend the sphere of military justice and seeks to make civilian authority the handmaiden of military discipline. When a member of the Armed Forces stands accused before a civilian tribunal, he is protected with his full constitutional armor. His posture is no different from that of any other defendant so far as the protection of the Constitution is concerned. His military status cannot shear him of his basic rights.

Recent Supreme Court decisions have expanded the protection of the Fifth Amendment.[6] The most recent, the *Miranda* decision, requires that once the process of custodial interrogation has commenced, the defendant must be fully apprised of his constitutional rights. They are: the right to remain silent; the right to have counsel present during the interrogation; the right, if unable to afford counsel, to have court-appointed counsel present during the interrogation; and the knowledge that information elicited during the interrogation may be used against him in a court of law. *Miranda* mandates that, absent a clear communication of these rights, and an intelligent waiver of them, any statements which are the product of custodial interrogation must be suppressed. The standard to be used in evaluating the interrogation's compliance with the Constitution is strict and unyielding. Ritualistic formulas will not suffice. The presumption is that the defendant who has not been completely informed of his rights is ignorant of them.

"To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of that right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, *and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.* Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. *But unless and until such warning and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of the interrogation can be used*

6. Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

*against him."* 384 U.S. at 478–479, 86 S.Ct. at 1630 (emphasis added). Employing the *Miranda* guidelines, the Court finds that the two statements were taken from the defendant in violation of his rights under the Fifth Amendment. He was not informed of his right being unable to afford counsel, to have present at any interrogation counsel which the Court would appoint for him. That the defendant, when informed by the United States Commissioner of his right to have counsel provided, promptly demanded legal assistance, fortifies the Court's conclusion that the defendant was not properly informed of his rights, and did not waive them. Defendant's conduct before the United States Commissioner strongly suggests that had he been aware of the availability of free counsel he would have demanded such assistance. Since the two statements were elicited during a process of custodial interrogation, during which the standards of *Miranda* were not heeded, they must be suppressed as evidence.

The second part of the defendant's motion is directed to the keys which were seized from the defendant in the course of the strip search at OSI headquarters. The defendant challenges the admissibility of the keys on the ground that they are the fruits of a search which violated the Fourth Amendment.

"The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated * * *." U.S.Const. Amend. IV (emphasis added).

Under the Fourth Amendment and the *Weeks* case,[7] which excludes from evidence material seized in contravention of the Amendment, the focus of the inquiry is the reasonableness of the search.

"It is well settled that Federal Courts expect searches to be made under the authority of a warrant whenever possible." Davis, Federal Searches and Seizures ¶ 2.0 (1964). Traditionally, courts have been hesitant to permit the introduction into evidence of material seized in a search conducted without a warrant when the objection that the Fourth Amendment has been transgressed is raised. Yet there are a few well-recognized exceptions to the general rule.[8] The most significant exception tolerates searches "incident to a valid arrest." The scope of this exception fluctuates, and the standards surrounding its application are imprecise, but probably the best working definition is to be found in the *Agnello* case:[9]

"The right without a search warrant *contemporaneously* to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find, and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted. * * * The legality of arrests or of the searches and seizures made at the home of Alba is not questioned. Such searches and seizures naturally and usually appertain to and attend such arrests. But the right does not extend to other places. Frank Agnello's house was several blocks distant from Alba's house, where the arrest was made. * * * That search cannot be sustained as an incident of the arrests." 269 U.S. at 30–31, 46 S.Ct. at 5 (emphasis added).

7. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

8. *Viz.*, the right to search automobiles, vessels and other conveyances suspected of carrying contraband where the securing of a warrant would be impractical. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Also excepted from the general rule necessitating a warrant are searches conducted with the consent of the person whose privacy is being invated. Woodard v. United States, 102 U.S.App.D.C. 393, 254 F.2d 312 (D.C. Cir. 1958).

9. Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925).

*Agnello* dealt with the search of a dwelling several blocks removed from the scene of the arrest. However, as mentioned above it is thought of as the landmark case in the area of searches incident to a valid arrest. And, it contains the requirement that the search be "contemporaneous" with the arrest. The defendant adroitly seizes upon the word "contemporaneous" in *Agnello,* and using language from Blackford v. United States, 247 F.2d 745 (9th Cir. 1957), seeks to mold a new standard for searches of the immediate person of those arrested. In *Blackford* the Ninth Circuit was asked to pass upon a bizzare search of the defendant for narcotics which had been secreted upon his person. In delineating the relevant standard, the Court said:

"[The Fourth Amendment] makes no differentiation between persons and property. It does not value property over human anatomy, nor differentiate between them." 247 F.2d at 750.

The defendant's agile argument, that *Blackford* requires the "contemporaneous" standard of *Agnello* to be applied to searches of the person, must be rejected. When an individual is arrested the arresting officer takes custody of the person and his immediate possessions— such is the meaning of arrest. Charles v. United States, 278 F.2d 386 (9th Cir. 1960).

In *Charles,* the defendant was arrested for assault and battery. During the course of the arrest, and after the defendant had been frisked, the arresting officers were apprised of the possibility of a narcotics violation. A second search of the defendant was instituted. He was instructed to empty his pockets. Among their contents was some marijuana which formed the basis for his indictment. Unquestionably, the second search was not "contemporaneous" with the defendant's arrest. Yet the Court upheld the second search, noting a distinction between the protection afforded property and that accorded to the person of one lawfully arrested.

"[I]t seems to us that a search of the person of the accused, even for the purpose of uncovering evidence of a crime other than that which is charged, is generally incident to a valid arrest. Power over the body of the accused is the essence of his arrest; the two cannot be separated. To say that the police may curtail the liberty of the accused but refrain from impinging upon the sanctity of his pockets except for ennumerated reasons is to ignore the custodial duties which devolve upon arresting authorities. Custody must of necessity be asserted initially over whatever the arrested party has in his possession at the time of apprehension." 278 F.2d at 388.

The case offering the closest parallel to the instant case is Baskerville v. United States, 227 F.2d 454 (10th Cir. 1955). There the defendant was arrested on December 23rd for a series of acts including the forging of checks and counterfeiting. He was taken to the Denver jail where he was searched. His personal property was removed, placed in an envelope, and given to the property custodian. On January 6th a Secret Service agent took the defendant's envelope from the property custodian and thoroughly examined its contents. The agent found an identification card from the Department of Agriculture which had been used in the perpetration of the crimes for which the defendant was being prosecuted. The card's admission into evidence was permitted by the trial court whose action was sustained on appeal. The Appellate Court rejected the defendant's argument that the search was not incident to a valid arrest because not contemporaneous with the actual arrest.

"Counsel for Baskerville concede that the arrest was lawful. The search was incident to a lawful arrest. The fact that the search was not made until Baskerville was taken to the County Jail from the point of the arrest in Denver, which was only a comparatively short time, did not, in our

opinion, prevent the search from being an incident to a lawful arrest." 227 F.2d at 456.

There is, however, a second prong to the defendant's attack upon the seizure of the keys. The defendant invokes the doctrine that general exploratory searches are not tolerated.[10] He argues that, since he had been earlier frisked for weapons at the scene of the arrest, the search could not have been to disclose weapons but must have been exploratory. Nor, the argument continues, could the search have been to uncover the instrumentalities of crime since the defendant had been apprehended in possession of the stolen vehicle, and that vehicle had been returned intact to its owner. The defendant cites United States v. Tate, 209 F.Supp. 762 (D.Del.1962) (Layton, J.). The *Tate* case involved a defendant who was arrested for speeding. After the defendant vociferously protested his innocence, forcing the arresting officer to subdue him with handcuffs, he was searched for weapons and placed in the squad car. Only then was his automobile searched, disclosing the presence of a sawed-off shotgun which formed the basis for the Federal prosecution. Judge Layton suppressed the evidence yielded by the search of the car, condemning the search as "exploratory." The search was fatally defective in that it lacked a specific objective at its commencement.

The *Tate* case is inapposite. It involved the search of an automobile; property, not the person of the accused. Further, it involved a search lacking a specific objective; the present case involved a search for a specific objective—weapons.

To determine whether a search has a specific objective requires an exploration of the arresting officer's state of mind. Standards whose application requires the examination of subjective criteria are notoriously imprecise. But that does not mean they are unworkable. One method of determining whether the arresting officer's state of mind was permissibly orientated to a specific objective is to inquire whether he acted pursuant to a departmental directive rather than merely upon his own initiative. Here there was such a directive which is set forth in full above. OSI Manual ¶ 2–1–24.

The Court should not be understood as holding that unreasonable behavior, violative of the Fourth Amendment, can be cannonized by administrative fiat. There must be a consideration of the reasonableness of the administrative directive before it can be said that the Fourth Amendment has been complied with.

■ Reasonableness is a flexible standard. It has long been recognized that military personnel, and those who enter upon a military reservation surrender some of their individual rights so that military discipline and security may remain inviolate.[11]

■ Recalling that the defendant was a military man, arrested by military authorities, this Court holds that the OSI directive that all persons be strip-searched for weapons prior to interrogation is not unreasonable, and that the defendant's Fourth Amendment rights were not trammeled by the OSI personnel's adher-

---

10. Go-Bart Importing v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931).

11. See, e. g., United States v. Grisby, 335 F.2d 652 (4th Cir. 1964), where the Court was called upon to review a search of the quarters of a military man which were located on a military reservation. The Court sustained the search over a Fourth Amendment objection, commenting that:

"[S]earches of * * * property on military reservations * * * stand on a very different footing from civilian property unrelated to military authority." 335 F.2d at 654.

See also Burns v. Wilson, 346 U.S. 137, 140, 73 S.Ct. 1045, 1048, 97 L.Ed. 1508 (1953).

"[T]he rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment. The Framers expressly entrusted that task to Congress."

ence to the directive. The motion to suppress the keys is denied.

There is yet another motion before the Court. Defendant asks that the information against him be dismissed on the ground that it is the product of evidence seized in violation of the defendant's constitutional rights. This motion is predicated upon the supposition that both the keys and the statements are suppressible. Since the keys have been found to be constitutionally admissible evidence, this motion lacks an essential prerequisite. The Court is unable to conclude that the information is not sufficient merely because the two statements have been suppressed, because the keys remain admissible. The motion to dismiss the information is denied.

Submit order.